**Docket No. 2016-2335**

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

GODADDY.COM, LLC,

*Plaintiff-Appellee,*

v.

RPOST COMMUNICATIONS LIMITED, RMAIL LIMITED,
RPOST INTERNATIONAL LIMITED
and RPOST HOLDINGS INCORPORATED,

*Defendants-Appellants.*

*Appeal from the United States District Court for the District of Arizona
in Case No. 2:14-cv-00126-JAT · Honorable James A. Teilborg.*

## BRIEF OF APPELLANTS

LEWIS E. HUDNELL, III, ESQ.
HUDNELL LAW GROUP PC
800 West El Camino Real, Suite 180
Mountain View, California 94040
(650) 564-7720 Telephone
(347) 772-3034 Facsimile

*Attorney for Defendants-Appellants,
RPost International Limited,
Rmail Limited, Rpost Communications
Limited and Rpost Holdings
Incorporated*

September 26, 2016



COUNSEL PRESS · (800) 3-APPEAL                    PRINTED ON RECYCLED PAPER

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

GoDaddy.com, LLC    **v.**    RPost Communications Limited, et al.

Case No.    16-2335

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee)☐ (amicus)☐ (name of party)

RPost Communications Limited, RPost Holdings, Inc., RMail Limited, RPost International Limited

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| RPost Communications Limited | | None |
| RPost Holdings, Inc. | | RPost Communications Ltd. (parent) |
| RMail Limited | | None |
| RPost International Limited | | None |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Lewis E. Hudnell, III, Hudnell Law Group P.C.; Kenneth Motolenich-Salas, Gallagher & Kennedy P.C.

Sep 26, 2016

**Date**

/s/ Lewis E. Hudnell, III

**Signature of counsel**

Please Note: All questions must be answered

Lewis E. Hudnell, III

**Printed name of counsel**

cc:

Reset Fields

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF CONTENTS.....................................................................................i

TABLE OF AUTHORITIES .........................................................................iv

TABLE OF ABBREVIATIONS ......................................................... viii

STATEMENT OF RELATED CASES ....................................................x

I.     JURISDICTIONAL STATEMENT ................................................1

II.    STATEMENT OF THE ISSUES ...................................................1

III.   STATEMENT OF THE CASE ........................................................2

       A.    Factual Background and Procedural History ........................2

       B.    Overview of the Patents-in-suit.............................................6

             1.    The Tomkow patents.....................................................6

             2.    The Feldbau patent................................................13

IV.    SUMMARY OF THE ARGUMENT ...........................................15

V.     ARGUMENT.................................................................................18

       A.    Standard of Review ............................................................18

       B.    The District Court Erroneously Determined that it Had
             Jurisdiction over GoDaddy's Eligibility Challenge ...........19

             1.    Ineligibility is not a litigation defense under §282(b) .............19

             2.    *Versata* did not hold that a district court has authority to
                   decide eligibility challenges....................................21

i

3.   The legislative history of §282(b) shows that Congress never authorized ineligibility as a litigation defense ...............22

4.   The Supreme Court has never held that ineligibility is a litigation defense ....................................................................23

5.   The Court has never held that ineligibility is a litigation defense ....................................................................25

C.   Framework for Determining Eligibility ............................................27

D.   The District Court Erred in Invalidating the '219 Claims under §101...............................................................................30

1.   The '219 claims are not directed to an abstract idea ...............30

2.   The '219 claims recite an inventive concept ...........................35

E.   The District Court Erred in Invalidating the '913 Claims under §101...............................................................................38

1.   The '913 claims are not directed to an abstract idea ...............38

2.   The '913 claims recite an inventive concept ...........................41

F.   The District Court Erred in Invalidating the '104 Claims under §101...............................................................................44

1.   The '104 claims are not directed to an abstract idea ...............44

2.   The '104 claims recite an inventive concept ...........................45

G.   The District Court Erred in Invalidating the '198 Claims under §101...............................................................................48

1.   The '198 claims are not directed to an abstract idea ...............48

2.   The '198 claims recite an inventive concept ...........................49

H.    The District Court Erred in Invalidating the '389
Claims under §101................................................................50

1.    The '389 claims are not directed to an abstract idea ...............50

2.    The '389 claims recite an inventive concept ...........................51

I.    The District Court Erred in Invalidating the '199
Claims under §101................................................................54

1.    The '199 claims are not directed to an abstract idea ...............54

2.    The '199 claims recite an inventive concept ...........................55

J.    The District Court Erred in Exercising Subject-Matter
Jurisdiction over the '219 Patent.........................................56

1.    The district court erroneously found that RPost took an
affirmative act regarding the '219 patent..................................57

VI.    CONCLUSION............................................................................60

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*Alice Corp. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)............................................................*passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (U.S. 1986) ............................................................18

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
543 F.3d 657 (Fed. Cir. 2008) ........................................18, 19, 26

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
132 S. Ct. 1794 (2012).................................................................24

*Ass'n for Molecular Pathology v. USPTO*,
653 F.3d 1329, 1344 (Fed. Cir. 2011) ........................................57

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
2016 U.S. App. LEXIS 11687 (Fed. Cir. June 27, 2016)......................*passim*

*Bilski v. Kappos*,
561 U.S. 593 (2010)...............................................................24, 36

*CLS Bank Int'l v. Alice Corp.*,
717 F.3d 1269 (Fed. Cir. 2013) .............................................26, 29

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .............................................*passim*

*DealerTrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012) .......................................25, 26, 28

*Diamond v. Diehr*,
450 U.S. 175 (1981)...........................................20, 21, 24, 26, 31

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ....................... 30, 31, 33, 38, 39, 51

*Furnace v. Sullivan*,
705 F.3d 1021 (9th Cir. 2013) ....................................................18

*Graham v. John Deere Co.*,
 383 U.S. 1 (1966)........................................................................24, 26

*Grober v. Mako Prods., Inc.*,
 686 F.3d 1335 (Fed. Cir. 2012) ...................................................18

*Hagans v. Lavine*,
 415 U.S. 528 (1974)......................................................................24, 25

*Hendler v. United States*,
 952 F.2d 1364 (Fed. Cir. 1991) ...................................................57

*In re TLI Communs. LLC Patent Litig.*,
 823 F.3d 607 (Fed. Cir. 2016) .....................................................30

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*,
 599 F.3d 1377 (Fed. Cir. 2010) ...............................................58, 59

*Internet Patents Corp. v. Active Network, Inc.*,
 790 F.3d 1343 (Fed. Cir. 2015) ...................................................38

*Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*,
 309 F.3d 1365 (Fed. Cir. 2002) ...................................................32

*Invitrogen Corp. v. Clontech Labs., Inc.*,
 429 F.3d 1052 (Fed. Cir. 2005) ...................................................57

*Maryland Casualty Co. v. Pac. Coal & Oil Co.*,
 312 U.S. 270 (1941)......................................................................56

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
 132 S. Ct. 1289 (2012).............................................................24, 28, 37

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
 2016 U.S. App. LEXIS 16703 (Fed. Cir. Sep. 13, 2016).....................*passim*

*MedImmune, Inc. v. Genentech, Inc.*,
 549 U.S. 118 (2007)......................................................................56, 58

*Microsoft Corp. v. DataTern, Inc.*,
 755 F.3d 899 (Fed. Cir. 2014) ................................................18, 59

v

*Microsoft Corp. v. i4i Ltd. Partnership*,
   131 S. Ct. 2238 (2011)....................................................................29

*MySpace, Inc. v. GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012) ......................................20, 26, 27

*Prasco, LLC v. Medicis Pharm. Corp.*,
   537 F.3d 1329 (Fed. Cir. 2008) ................................................59

*Research Corp. Techs. v. Microsoft Corp.*,
   627 F.3d 859 (Fed. Cir. 2010) ....................................21, 27, 28, 39

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
   F.3d 1311 (Fed. Cir. 2015) ......................................................22, 23

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ..................................................28

*Versata Dev. Group, Inc. v. SAP Am., Inc.*,
   793 F.3d 1306 (Fed. Cir. 2015) ................................................21

*Webster v. Fall*,
   266 U.S. 507 (1925)....................................................................25

*Will v. Mich. Dept. of State Police*,
   491 U.S. 58 (1989)......................................................................24

## STATUTES, RULES AND REGULATIONS

28 U.S.C. § 1295(a)(1).......................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. §1338(a) ...........................................................................1

35 U.S.C. § 101 .......................................................................*passim*

35 U.S.C. § 102 ........................................................ 19, 20, 22, 25, 26, 27

35 U.S.C. § 103 ........................................................ 15, 19, 20, 25, 26, 27

35 U.S.C. § 282 ..............................................................................26

vi

35 U.S.C. § 282(b) ................................................................15, 19, 22, 23

35 U.S.C. § 282(b)(2).....................................................15, 19, 20, 21, 23

Rev. Stat. § 4886 ...........................................................................................22

Rev. Stat. § 4920 ...........................................................................................22

37 C.F.R. § 42.301(b) ...................................................................................12

## OTHER AUTHORITIES

H.R. Rep. No. 1923, 82d Cong., 2d Sess. (1952) ....................................22

P.J. Federico, "Commentary on the New Patent Act," 35 U.S.C.A. 1
    (1954), reprinted at 75 J. Pat. & Trademark Off. Soc'y
    161, 175-176 (1993) ...............................................................22, 23

S. Rep. No. 1979, 82d Cong., 2d Sess. (1952) ..................................22, 24

## TABLE OF ABBREVIATIONS

| ABBREVIATION | TERM |
|---|---|
| RPost | Defendants-Appellants RPost Communications Limited, RPost Holdings, Inc., RMail Limited, and RPost International Limited |
| RPC | RPost Communications Limited |
| RPH | RPost Holdings, Inc. |
| RMail | RMail Limited |
| RPI | RPost International Limited |
| RPost | RPC, RPH, RMail, and RPI |
| GoDaddy | Plaintiff-Appellee GoDaddy.com, LLC |
| The '389 patent | U.S. Patent No. 8,209,389 |
| The '913 patent | U.S. Patent No. 8,224,913 |
| The '104 patent | U.S. Patent No. 8,161,104 |
| The '198 patent | U.S. Patent No. 8,468,198 |
| The '199 patent | U.S. Patent No. 8,468,199 |
| The Tomkow patents | The '389, '913, '104, '198, and '199 patents |
| The '219 patent or the Feldbau patent | U.S. Patent No. 6,182,219 |
| The '334 patent | U.S. Patent No. 6,571,334 |
| The Feldbau patents | The '219 and '334 patents |

| | |
|---|---|
| The patents-in-suit | The Tomkow patents and the '219 patent |
| The '372 patent | U.S. Patent No. 7,966,372 |
| The '389 claims | Claims 1, 7, 12, 14, and 15 of the '389 patent |
| The '913 claims | Claims 1 and 2 of the '913 patent |
| The '104 claims | Claims 1, 9, 27, and 32 of the '104 patent |
| The '198 claims | Claims 1, 6, 7, 10, 18, 23, 32, and 35 of the '198 patent |
| The '199 claims | Claims 1, 2, and 3 of the '199 patent |
| The '219 claims | Claims 60, 62, 66, and 69 of the '219 patent |
| USPTO | United States Patent and Trademark Office |
| PTAB | Patent Trial and Appeal Board |
| CBM | Covered Business Method |
| AIA | America Invents Act |
| The *Sophos* cases | *Sophos Inc. v. RPost Holdings, Inc. et al.*, 1:13-cv-12856-DJC (D. Mass.); *RPost Holdings, Inc. et al. v. Sophos, Inc.*, 1:14-cv-13628-DJC (D. Mass.) |
| The *Amazon* case | *RMail Limited v. Amazon.com, Inc.*, 2:10-cv-258-JRG (Lead Case) (E.D. Tex.) |

## STATEMENT OF RELATED CASES

Under Federal Circuit Rule 47.5(a), RPost states that that there have been no other appeals in this civil action before this Court or any other appellate court. Under Federal Circuit Rule 47.5(b), RPost further states that one or more of the '104, '389, '913, '198, '199, and '219 patents are the subject of the following patent infringement and patent declaratory judgment lawsuits that are pending in various district courts:

| U.S. District Court Case | Patents in Common with this Case |
|---|---|
| *RMail Limited v. Amazon.com, Inc.*, 2:10-cv-258-JRG (Lead Case) (E.D. Tex.) | '219 patent |
| *RPost Holdings, Inc., et al. v. Constant Contact, Inc. et al.*, 2:12-cv-510 (E.D. Tex.) | '104, '389, '913, and '219 patents |
| *RPost Holdings, Inc. et al v Epsilon Data Mgmt., Inc.*, 2:12-cv-511 (E.D. Tex.) | '104, '389, '913, and '219 patents |
| *RPost Holdings, Inc. et al v Exact Target, et al.*, 2:12-cv-512-JRG (E.D. Tex.) | '219 patent |
| *RPost Holdings, Inc., et al. v. Experian Mktg. Solutions, Inc.*, 2:12-cv-513-JRG (E.D. Tex.) | '104, '389, '913, and '219 patents. |
| *RPost Holdings, Inc., et al. v. Strongmail Sys., Inc. et al.*, 2:12-cv-515-JRG (E.D. Tex.) | '104, '389, '913, and '219 patents |
| *RPost Holdings, Inc., et al. v. Vocus, Inc.*, 2:11-cv-516-JRG (E.D. Tex.) | '104, '389, '913, and '219 patents |
| *RPost Holdings, Inc., et al. v. Infogroup, Inc. et al.*, 2:12-cv-517-JRG (E.D. Tex.) | '104, '389, '913, and '219 patents |
| *RPost Holdings, Inc., et al. v. Docusign, Inc. et al.*, 2:12-cv-683-JRG (E.D. Tex.) | '104, '389, '913, and '219 patents |
| *RPost Holdings, Inc., et al. v. Yesware, Inc.et al.*, 2:13-cv-953-RS (E.D. Tex.) | '104 and '198 patents |
| *Yesware, Inc. v. RPost Holdings, Inc. et al.*, 1:13-cv-12837-RS (D. Mass.) | '104 and '198 patents |

| *Sophos Inc. v. RPost Holdings, Inc. et al.*, 1:13-cv-12856-DJC (D. Mass.) | '389, '913, and '199 patents |
| *RPost Holdings, Inc. et al. v. Sophos, Inc.*, 1:14-cv-13628-DJC (D. Mass.) | '389, '913, and '199 patents |
| *MIS Sciences Corporation v. RPost Communications Limited*, 3:14-cv-376-VC (N.D. Cal.) | '104, '389, '913, '198, and '199 patents |

One or more of these cases may be affected by this Court's decision in the pending appeal.

# I.     JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).  The district court purportedly had jurisdiction under 28 U.S.C. §1331 and §1338(a).  In this appeal, RPost contends that the district court did not have jurisdiction over GoDaddy's §101 challenge and that the district court improperly exercised subject-matter jurisdiction over the '219 patent.  The district court entered a final judgment on June 7, 2016.  Appx61.  RPost timely noticed this appeal on July 7, 2016.  Appx132, #364.

# II.     STATEMENT OF THE ISSUES

This appeal raises the following issues:

1.     Did the district court err in deciding that it had jurisdiction to determine whether the patents-in-suit claim eligible subject matter, thereby exceeding its congressionally delineated authority?

2.     Was the district court's grant of summary judgment of invalidity of the '219 claims under the abstract ideas exception to patentability erroneous?

3.     Was the district court's grant of summary judgment of invalidity of the '913 claims under the abstract ideas exception to patentability erroneous?

4.     Was the district court's grant of summary judgment of invalidity of the '104 claims under the abstract ideas exception to patentability erroneous?

5.     Was the district court's grant of summary judgment of invalidity of the '198 claims under the abstract ideas exception to patentability erroneous?

6.      Was the district court's grant of summary judgment of invalidity of the '389 claims under the abstract ideas exception to patentability erroneous?

7.      Was the district court's grant of summary judgment of invalidity of the '199 claims under the abstract ideas exception to patentability erroneous?

8.      Was the district court's denial of RPost motion to dismiss the '219 patent for lack of subject-matter jurisdiction erroneous?

## III.    STATEMENT OF THE CASE

### A.    Factual Background and Procedural History

This action is a patent declaratory judgment action filed by GoDaddy that arose out of nearly six months of pre-suit communications between the parties. On July 16, 2013, Jake Finnell of RPost U.S., Inc., an email security company, sent a mass email to a number of companies advising them of RPost's patent rights. Appx164-166. The email requests that the addressees review and evaluate six patents owned by RPC relating to email tracking of and/or reports of delivery, email delivery failure, and/or determining opening of emails using SMTP, ESMTP, HTTP, or other data protocols—the '372 patent, the '104 patent, the '389 patent, the '913 patent, the '198 patent, and the '199 patent. Appx165. The July 16 email invites the addressees to review several other patents as background, including two patents owned by RMail—the '219 patent and its continuation, the '334 patent. Appx165-166. The signature block of the July 16 email contains a lengthy list of foreign and

2

U.S. patents and U.S. published applications that happens to include the patents-in-suit. Appx166. The July 16 email also invites the addressees to contact RPost within two weeks if they would like to engage in a confidential discussion related to their use of RPost's services and patented technology. *Id.* The July 16 email does not mention GoDaddy, does not identify any GoDaddy products, does not include any claim charts, and does not mention litigation. Appx164-166.

On October 4, 2013, Ray Owens of RPost U.S., sent a follow up letter to Nima Kelly, General Counsel of GoDaddy, with the Re: line "Claim Charts per Patent Infringement Notice." Appx168-176. The October 4 letter states that GoDaddy is "offering products and services, namely Express Mail Marketing, may infringe patents owned by RPost." Appx170. The October 4 letter includes preliminary summary analyses comparing the claims of the Tomkow patents against a generic description of a system that practices those patents. Appx171-176. The preliminary summary analyses do not refer to any specific GoDaddy product. *Id.* The October 4 letter also includes a list of over 60 foreign and U.S. patents and published U.S. Patent Applications owned by RPost and related entities, including the patents-in-suit. Appx176. The October 4 letter states that RPost "would like to discuss with you a business resolution to this matter in the next two weeks." Appx170.

On or about October 22, 2013, Jerry Silver of RPost U.S., contacted GoDaddy's Associate General Counsel, Karl Fazio, to discuss a potential business

arrangement.  Appx1274, ¶3.  Mr. Silver suggested that the parties enter into a mutual non-disclosure agreement which, once executed, would allow him to discuss previous agreements relating to the patents-in-suit.  *Id.*, ¶4.  On November 11, 2013, RPC entered into an NDA with GoDaddy.  Appx1275, ¶5.  After the parties executed the NDA, Mr. Silver provided Mr. Fazio a document entitled "Summary of Preliminary Infringement Analysis," that lists the '219 patent on the front page under the heading "Additional Recommend Review" along with four other patents.  *Id.*, ¶7-8; Appx1279.  The document, however, does not contain any analysis of the '219 patent or the '334 patent and does not reference the '219 patent other than on the front cover.  Appx1275, ¶10.  During the course of the subsequent discussions, Mr. Silver did not threaten GoDaddy with litigation.  Appx1275, ¶11.  Mr. Silver also never asserted that GoDaddy infringes the Feldbau patents.  *Id.*, ¶12.  Mr. Silver further never asserted that any specific GoDaddy product infringes the Feldbau patents.  *Id.*, ¶13.

On January 22, 2014, GoDaddy filed its Original Complaint for declaratory judgment of non-infringement and invalidity of the Tomkow patents (Counts III-XII).  Appx68, #1.  On May 22, 2014, RPI and RMail moved to dismiss Counts III-XII of the Original Complaint for lack of standing because these entities do not own a legal right to the Tomkow patents.  Appx75, #38.  GoDaddy, instead of responding to the motion to dismiss, filed a First Amended Complaint.  Appx76, #46.  The First

4

Amended Complaint adds Counts XIII-XVI, which seek declaratory judgment of non-infringement and invalidity of the Feldbau patents. Appx707-713.

On August 26, 2014, RPost moved to dismiss Counts XIII-XVI for lack of subject-matter jurisdiction. Appx81, #72. On September 30, 2014, the Court ordered that RPost answer Counts XIII-XVI while its motion to dismiss those counts was still pending. Appx84, #86. In its answer, RPost asserted infringement counterclaims on the Feldbau patents conditioned on the outcome of its motion to dismiss. Appx1860-1867. Subsequently, before the deadline to amend pleadings, RPost sought leave to file a first amended answer to Counts XIII-XVI. Appx87, #100. In its proposed amendments, RPost again asserted infringement counterclaims on the Feldbau patents conditioned on the outcome of its motion. Appx2220-2227.

On December 9, 2014, the Court granted RPost's motion to dismiss as to the '334 patent but denied it as to the '219 patent. Appx2371-2384. The only distinction that the district court drew between the alleged affirmative acts that RPost took with respect to the '334 patent and the '219 patent is that "RPost drew attention to [the '219 patent] by conspicuously listing it under 'Additional Recommended Review' on the title page of the Presentation alongside one of the Tomkow Patents." Appx2379. Given that the Court dismissed the counts relating to the '334 patent, the Court ordered that RPost file an amended answer that responds to the surviving counts. Appx2383. RPost filed an amended answer asserting counterclaims on the

patents-in-suit.  Appx2400-2412.  Accordingly, this case proceeded on the Tomkow patents and the '219 patent.

The district court conducted a claim construction hearing and issued a claim construction order construing several disputed terms of the patents-in-suit. Appx4675-4813.  After the close of fact discovery, GoDaddy moved for summary judgment asserting, among other things, invalidity under §101 of the then remaining asserted claims of the patents-in-suit.  Appx112, #257.  The district court granted GoDaddy's motion and invalidated all of the asserted claims under §101.  Appx1-60.  RPost appeals from the district court's grant of summary judgment.

**B.    Overview of the Patents-in-suit**

**1.    The Tomkow patents**

Dr. Terrance Tomkow of RPost is the sole inventor of the Tomkow patents. The Tomkow patents all stem from the same parent application, which issued as the '372 patent, and all are titled "System and Method for Verifying Delivery and Integrity of Electronic Messages."  Dr. Tomkow first conceived of the invention that led to the Tomkow patents when he was ordering something over the internet in the late 1990's.  Appx604, 137:3-7.  It occurred to him that if he provided his payment information over the internet and the merchant simply denied that they received it, then he had no way to prove that he actually ordered something from that merchant. *Id.*, 137:8-20.  At that time, numerous techniques existed to protect the recipient of

6

an electronic message so that he or she could be sure that the sender was who he said he was and that the content of the message had not changed on its way to the recipient. *Id.*, 138:2-11. Dr. Tomkow realized, however, that no technology existed to protect the sender so that he or she could show that an electronic message that they had transmitted had been received. *Id.*

Dr. Tomkow then began to think about the problem of proving delivery of a message in the context of email. *Id.*, 138:13-139:24. The conventional thinking at the time was that such proof required some sort of action from the recipient acknowledging that he or she had received the email. *Id.* Dr. Tomkow thought, however, that if delivery could be proved to the recipient's email server or email client, then that delivery could serve as proof of delivery to the recipient without requiring the recipient's participation or cooperation. *Id.* Accordingly, Dr. Tomkow sought to discover technological methods to prove delivery of an email to a recipient's mail server or mail client. *Id.* Each of the Tomkow patents claims a different technical solution for proving email delivery or extensions of this technology. Appx.6005, 140:1-3.

Figure 1 of each of the Tomkow patents illustrates an email system in accordance with one embodiment of the invention claimed in the Tomkow patents:



FIG. 1

Appx5722.

The '913 patent addresses the problem of verifying the delivery of an email from a sender to a recipient through an intermediate server. Appx5720-5754. As illustrated in Figure 1, a registering mail transport agent (MTA) of the sender establishes a dialog using a mail transport protocol, in this case Extended Simple Mail Transport Protocol (ESMTP), with a recipient MTA. The dialog includes a sequence of commands and responses exchanged between the two MTAs in which they communicate with each other in order to transmit the email. Appx5745, 12:16-13:65. The registering MTA will transmit the email to the recipient's MTA in accordance with the protocol. *Id.* In order to obtain proof of delivery, the registering MTA records a portion of the mail transport protocol dialog generated by the transmission of the message in which the recipient's MTA accepts or declines delivery of the message. *Id.*, 12:7-9. Because the registering MTA records proof of

8

delivery separate from the sender and the recipient, the system can provide proof of delivery of an email without requiring compliance or co-operation of the recipient and without requiring the sender or the recipient to use additional software. Appx5740, 2:64-3:1; Appx5751, 24:9-11.

The '389 patent addresses the problem of verifying the receipt of an email sent from a sender to a recipient through an intermediate server displaced from the recipient. Appx5682-5718. The claimed embodiments of the '389 patent build on the '913 patent in that in addition to recording a portion of the mail transport protocol dialog, the registering MTA also records other indications that the recipient has received the email, such as a Delivery Status Notifications (DSN). Appx5709, 12:11-15. As shown in Figure 1, the registering MTA also creates a receipt that includes the recorded protocol dialog and the DSN reports, which it in turn provides to the sender. Appx5710, 14:55-15:45.

The '199 patent, which is a continuation of the '389 patent, addresses the problem of verifying the failure to deliver an email sent from a sender to a recipient through an intermediate server displaced from the recipient. Appx5644-5680. The claimed embodiments of the '199 patent differ from those of '389 patent in that the registering MTA records a portion of the mail transport protocol dialog generated by the transmission of the message from the registering MTA to the recipient MTA and an indication that the registering MTA has failed to deliver the message, such as

9

a DSN that indicates delivery failure.  Appx5669, 12:26-40; Appx5670, 13:44-49.

In order to provide the sender proof of delivery failure, as shown in Figure 1, the

registering MTA may provide the sender a receipt containing the recorded dialog

and the DSN reports.  Appx5670, 13:44-49, 13:57-60.

The '104 patent extends the concepts of the '913, '389, and '199 patent and

addresses the problem of verifying the opening of an email sent from a sender to a

recipient through an intermediate server displaced from the recipient.  Appx5607-

5642.  As illustrated in Figure 1, the registering MTA receives an email from the

sender.  The registering MTA adds a link to the email that is configured to execute

when the message is opened at the recipient, which is represented by the tagged

message.  Appx5592, 8:15-28.  The registering MTA transmits the email to the

recipient.  When the email is opened, the link executes automatically and controls

the registering MTA to provide an indication that the email has been opened

independent of any configuration, capability, or action by the recipient's mail

system, client, or agent.  Appx5601, 26:49-27:7.  The registering MTA may then

create authenticable information related to the message, such as a receipt that

includes the indication of opening and that the registering MTA signs with its digital

signature, and transmit the authenticable information and the indication of opening

to the sender.  Appx5596, 15:31-41.  Because the opening of the email can be

verified without requiring the cooperation of the recipient or any additional software

at the sender and the recipient, and because the actual indication of opening occurs at the registering MTA, the recipient cannot repudiate that it opened the email. Appx5589, 2:62-3:2; Appx5600, 24:29-31.

The '198 patent, which is a continuation of the '104 patent, addresses the problem of verifying the opening or delivery of an email sent from a sender to a recipient through an intermediate server displaced from the recipient. Appx5607-5642. The claimed embodiments of the '198 patent differ from those of the '104 patent in that the registering MTA uses the executing of the link as an indication of the delivery of the email. Appx5640, 28:6-25. In order to provide the sender proof of delivery, as shown in Figure 1, the registering MTA may provide the sender authenticable information related to the message, such as a receipt that includes the indication of delivery and that the registering MTA signs with its digital signature, and transmit the authenticable information and the indication of delivery to the sender. Appx5634, 15:38-48.

The '389, '913, and '104 patents have each been the subject of CBM reviews before the PTAB. The PTAB denied petitions to institute CBM reviews of each of these patents. Appx6312-6324; Appx6325-6336; Appx6337-6348. The PTAB determined that the petitioner could not overcome RPost's arguments that the '104, '389, and '913 patents solve a technical problem—providing reliable proof of content and delivery of electronic messages—using technical solution—an

11

intermediate server without requiring the use of special email software by the sender or the recipient.   Appx6319-6323; Appx6332-6335; Appx6344-6347.   Thus, the petitioner failed to prove that these patents do not claim technological inventions. Therefore, these patents were not subject to CBM review.  *Id.*; *see also* 37 C.F.R. § 42.301(b) (defining a technological invention as one in which "the claimed subject matter as a whole recites a technological feature that is novel and un-obvious over the prior art; and solves a technical problem using a technical solution.").  In fact, the denial of CBM review of the '913 patent was the first of 69 decisions since the inception of CBM review in which the PTAB found a patent

ineligible for CBM review. *See* http://fishpostgrant.com/alert/ptab-first-cbm-review-denied-jurisdictional-grounds/  (last visited Jul. 8, 2016).

Just four days before the district court issued its summary judgment order, the court in the *Sophos* cases issued an order denying Sophos's motion for judgment on the pleadings under §101.  Appx7051-7078.  The court found that claims 1, 4, 6, 7, and 10-16 of the '389 patent; claims 1 and 2 of the '913 patent; and claims 1-3, 6, and 7 of the '199 patent were not directed to an abstract idea and claim an inventive concept.  Appx7074-7078.  Therefore, the court concluded that the claims were not ineligible under §101.  *Id.*

2.      **The Feldbau patent**

Ofra and Michael Feldbau are the inventors of the '219 patent, which is tilted "Apparatus and Method for Authenticating the Dispatch and Contents of Documents." Appx5976-6001. Like the Tomkow patents, the '219 patent also addresses the problem of protecting the sender in case a dispute arises between the sender and the recipient regarding the transmission of electronic information. Appx5985, 1:20-239. Figure 2 of the '219 patent illustrates a communications system in accordance with one embodiment of the claimed invention:



Appx5979.

The '219 patent solves the problem by providing the sender with evidence that it sent a dispatch to a particular destination at a particular time and that it had particular content. Appx5985, 2:57-61. As shown in Figure 2, the sender transmits the dispatch to a non-interested third party, known as an authenticator. Appx5987,

6:38-44. The authenticator associates information such as a time of its successful transmission and its contents to generate evidence capable of proving the dispatch and the contents of the dispatch—"authentication information." Appx5986, 3:29-36. The generation of evidence by the authenticator provides value and instills confidence in the transaction.

The authenticator secures the authentication information against tampering by the sender and the recipient by, for example, storing the information in a secure storage unit. Appx5988, 7:41-58. Alternatively, the authenticator may use mathematical association methods that would make any tampering easy to detect. *Id.* Such mathematical association methods may involve digital signatures, encryption, or a one-way hash. Appx5989, 10:47-11:2. Accordingly, the '219 patent improves upon conventional systems by providing non-repudiation evidence of electronically transmitted information. Appx5985, 2:57-61.

The validity of the '219 patent was challenged by an *ex parte* reexamination. The USPTO issued an *Ex Parte* Reexamination Certificate for the '219 patent confirming the validity of all of the reexamined claims. Appx5999-6001. In addition, the defendants in the *Amazon* case moved for summary judgment of invalidity of the '334 patent, the continuation of the '219 patent, under §101. The court summarily denied the motion. Appx6454-6455.

## IV.   SUMMARY OF THE ARGUMENT

The Court must reverse the district court's grant of summary judgment of invalidity of the patents-in-suit because the district court incorrectly concluded that it had statutory authority to decide GoDaddy's eligibility challenge under 35 U.S.C. §101.  Section 101 is not one of the defenses enumerated in 35 U.S.C. §282(b) that Congress allowed to be raised in a patent infringement action.  Only §282(b)(2) arguably covers eligibility under §101 and provides a defense of "[i]nvalidity . . . on any ground specified in part II as a condition for patentability".  But the only grounds specified in part II of the Patent Act as a condition for patentability are novelty under §102 and obviousness under §103, not eligibility under §101.  The legislative history of §282(b), and in particular the Federico Commentary to the 1952 Patent Act, also does not identify ineligibility as one of the permitted defenses.

Even if the district court had jurisdiction to decide GoDaddy's eligibility challenge, which it did not, the district court also erred in concluding that the patents-in-suit are invalid under §101.  In doing so, the district court misapplied the Supreme Court's two-part test for determining whether the patents-in-suit claim unpatentable abstract ideas by overgeneralizing the claims of the patents-in-suit in a manner inconsistent with the patents' disclosures, the district court's own claim construction, and this Court's precedent.

Specifically, the '219 claims are not directed to the abstract idea of collecting and providing information about a dispatch using a third party intermediary. Rather, the '219 claims are directed to a specific method for improving the ability of conventional data transmission systems to provide evidence that a dispatch was sent at a specific time to a specific receiving party. The '219 claims implement this method using an authenticator, which generates authentication data regarding the dispatch and requires a special purpose computer to secure the authentication data against tampering by the sender and the recipient.

Contrary to the district court's erroneous characterization of the claims, the '219 claims are still patentable because they recite specific limitations that further define the special nature and function of the authenticator. The authenticator's specific combination of features adds an inventive concept to the claimed method because they ensure that the generated authentication data is reliable and non-tamperable.

Also contrary to what the district court found, the Tomkow patents are not directed to the abstract idea of collecting and providing information regarding the delivery, non-delivery, or opening of a message. The Tomkow patents are directed to specific implementations for providing verifiable proof of the delivery, non-delivery, or opening of an email.

Notwithstanding the district court's mischaracterizations, the Tomkow patents are patent eligible because they solve the technical problem—the lack of sufficient forms of proof of email delivery, non-delivery, and opening—using a technical solution—an intermediate server that record a portion or other verifiable information regarding the delivery, non-delivery, or opening of the email. As such, they recite an inventive concept that provides a technical way to overcome the deficiencies of the prior art.

Finally, the '219 patent should not have even been considered at summary judgment because the district court erroneously denied RPost's motions to dismiss GoDaddy's declaratory judgment counts on the '219 patent for lack of subject-matter jurisdiction. The only allegedly affirmative act that RPost took regarding the '219 patent that it did not take regarding the '334 patent, which the district court dismissed, is that RPost listed the '219 patent, along with several other patents, on the face of a presentation that it provided to GoDaddy. The presentation did not otherwise concern the '219 patent. Thus, the additional act of listing the '219 patent on the front of a presentation did not constitute an affirmative act and the '219 patent should have been dismissed.

For all of these reasons and those set forth below, the district court's judgment of invalidity of the patents-in-suit must be vacated and reversed.

# V.    ARGUMENT

## A.    Standard of Review

Every issue raised in this appeal is reviewed *de novo*.  The Court reviews a grant of summary judgment under the law of the regional circuit.  *See Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012).  The Ninth Circuit reviews a grant of summary judgment *de novo*.  *See Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (U.S. 1986).

The Court reviews determinations of patent eligibility under 35 U.S.C. §101 *de novo*.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).  Statutory interpretation is also reviewed *de novo*.  *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 660 (Fed. Cir. 2008).

Finally, the Court reviews whether the district court lacked subject-matter jurisdiction *de novo*.  *See Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 903 (Fed. Cir. 2014).

**B.    The District Court Erroneously Determined that it Had Jurisdiction over GoDaddy's Eligibility Challenge.**

**1.    Ineligibility is not a litigation defense under §282(b).**

The district court erroneously determined that it had jurisdiction over GoDaddy's §101 eligibility challenge because Congress never authorized ineligibility as a defense that can be raised in patent litigation.  Patent defenses are statutory.  If a patent defense is not denominated within the Patent Act, then the Court lacks jurisdiction to address it.  *See Aristocrat Tech.*, 543 F.3d at 661-63.  Section 282(b) of the Act enumerates the defenses that may be raised in a patent infringement action.  *See* 35 U.S.C. §282(b).  As the district court stated, the only paragraph of §282(b) that is pertinent to this case is §282(b)(2), which states a defense of "(2) Invalidity of the patent or any claim in suit on any ground specified in part II as a condition for patentability."  35 U.S.C. §282(b)(2); Appx6.  But the plain language of §282(b)(2) does not authorize ineligibility as a defense.

Only two sections of part II of title 35 are specified as a "condition for patentability"—§102 titled "Conditions for patentability; novelty" and §103 titled "Conditions for patentability; non- obvious subject matter."  Conversely, §101 is titled "Inventions patentable."  No other section contained in Part II is specified as or includes the phrase "condition for patentability," either in the title or in the body.  Thus "[t]he two sections of part II that Congress has denominated as 'conditions of patentability' are §102 ('novelty and loss of right to patent') and §103 ('nonobvious

19

subject matter')." *See MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1260 (Fed. Cir. 2012).

The first error that the district court made was that it only addressed RPost's argument that the title of §101 proves that eligibility is not a valid patent litigation defense. Appx9. The district court never addressed the evidence in the actual text of §282(b)(2) that it does not apply to §101. *See Diamond v. Diehr*, 450 U.S. 175, 182 (1981) ("In cases of statutory construction, we begin with the language of the statute."). First, §282(b)(2) states "invalidity," not ineligibility. Invalidity and ineligibility are not the same. *See BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 2016 U.S. App. LEXIS 11687, at *31-33 (Fed. Cir. June 27, 2016) (contrasting patentability and eligibility); *DDR Holdings*, 773 F.3d at 1259 n. 6 ("Of course, patent-eligible does not mean patentable under, e.g., 35 U.S.C. §§102 and 103"). Also, §282(b)(2) states "any grounds specified . . . as a condition for patentability." The only grounds specified as a condition for patentability are §§102 and 103, not §101.

The district court also ignored evidence in the text of §101 that eligibility is not a condition of patentability. Section 101 states: "[w]hoever invents or discovers any new and useful process . . . or any new and useful improvement thereof, may obtain a patent therefore, *subject to the conditions and requirements of this title*." 35 U.S.C. §101 (emphasis added). Section 101 expressly distinguishes between the

categories of patentable subject matter and the conditions that they are subject to.

*See Diehr*, 450 U.S. at 189-91; *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d

859, 868 (Fed. Cir. 2010) ("The section 101 patent-eligibility inquiry is only a

threshold test. *See Bilski*, 130 S. Ct. at 3225. . . . [Section 101] approves the broad

categories of subject matter . . . itself directs primary attention to 'the conditions and

requirements of [Title 35].'").

> ### 2. *Versata* did not hold that a district court has authority to decide eligibility challenges.

Instead, the district court relied of this Court's holding in *Versata v. SAP*

*America, Inc.* to conclude that it had jurisdiction over GoDaddy's §101 challenge.

*Versata*, however, is not dispositive. *Versata* addressed whether the PTAB, not a

district court, exceeds the scope of its congressionally delineated authority in

deciding a §101 challenge in a CBM review under the AIA. *See Versata Dev.*

*Group, Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1330 (Fed. Cir. 2015). Although

*Versata* acknowledges that the section titles of the Patent Act supports the argument

that §101 is not a condition for patentability, *Versata* relies on the legislative history

of the AIA to conclude that the PTAB has the authority to consider §101 challenges.

*Id.* The legislative history of the AIA, however, is not the legislative history of the

1952 Patent Act, which enacted §282(b)(2). The district court recognized this

distinction but inexplicably failed to address any of the 1952 Patent Act legislative

history cited by RPost that shows that Congress did not intend ineligibility to be a litigation defense.  Appx8.

### 3.    The legislative history of §282(b) shows that Congress never authorized ineligibility as a litigation defense.

Before the 1952 Patent Act, Rev. Stat. §4886 specified the subject matter for which a patent could be obtained and recited conditions for patentability.  *See* P.J. Federico, "Commentary on the New Patent Act," 35 U.S.C.A. 1 (1954), reprinted at 75 J. Pat. & Trademark Off. Soc'y 161, 175-176 (1993).  In the 1952 Patent Act, Congress divided §4886 into two sections—§101 relating to the subject matter for which a patent may be obtained and §102 defining novelty and other conditions for patentability.  *See id.*; S. Rep. No. 1979, 82d Cong., 2d Sess., 5, 6, and 17 (1952); H.R. Rep. No. 1923, 82d Cong., 2d Sess., 6, 7, and 17 (1952).  The 1952 Patent Act also derived the language of what is now §282(b) from the defenses enumerated in Rev. Stat. §4920 to state the defenses that may be raised in an action involving the validity or infringement of a patent.  *See Federico*, 75 J. Pat. & Trademark Off. Soc'y at 216; S. Rep. No. 1979, 82d Cong., 2d Sess., 10 and 29 (1952); H.R. Rep. No. 1923, 82d Cong., 2d Sess., 10 and 29 (1952).  Section 4920 did not recite ineligibility as a defense and Congress incorporated the conditions that it did recite into §102. *See* Rev. Stat. §4920; *Federico*, 75 J. Pat. & Trademark Off. Soc'y at 216.

The Court recently examined the legislative history of §282(b) in *SCA Hygiene Products v. First Quality Baby Products* in order to determine whether

laches is a litigation defense under §282.  In concluding that it is, the Court exclusively relied on the Federico Commentary of the 1952 Patent Act, which identified laches as one of the defenses available under §282(b)(1).  *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1323 (Fed. Cir. 2015) (en banc), *cert. granted*, 136 S. Ct. 1824 (2016) ("We therefore consider the Federico Commentary to be a sufficiently reliable source on the meaning of §282.").  The Federico Commentary, however, does not recite ineligibility as one of the defenses under §282(b)(2):

> The second item specifies 'Invalidity of the patent or any claim in suit on any ground specified in Part II of this title as a condition for patentability'; this would include most of the usual defenses such as lack of novelty, prior publication, prior public use, lack of invention.

*See Federico*, 75 J. Pat. & Trademark Off. Soc'y at 215.  Because the district court also ignored this commentary, the district court erroneously concluded that Congress authorized ineligibility as a litigation defense.

### 4.    The Supreme Court has never held that ineligibility is a litigation defense.

The district court's claim that the Supreme Court unwaveringly considers ineligibility to be a viable defense is patent infringement litigation is also erroneous. Appx9.  The Supreme Court has never held that patent eligibility is a "condition of patentability" and therefore a viable invalidity defense under §282(b)(2).  At most, the Supreme Court suggested in *dictum* that "utility" is "condition of patentability."

*See Graham v. John Deere Co.*, 383 U.S. 1, 12 (1966). *Graham* did not, however, hold that eligibility is a condition of patentability. In fact, *Graham* did not even involve patent eligibility under §101.

Other Supreme Court decisions actually addressing patent eligibility under §101 contradict the notion in *Graham* that §101 defines any conditions for patentability. For example, in *Diamond v. Diehr*, the Supreme Court expressly distinguished between §101 and the conditions for patentability that follow:

> Section 101, however, is a general statement of the type of subject matter that is eligible for patent protection "subject to the conditions and requirements of this title." Specific conditions for patentability follow and § 102 covers in detail the conditions relating to novelty.

*See Diehr*, 450 U.S. at 189-91 (citing *in accord* S. Rep. No. 1979, 82d Cong., 2d Sess., 5 (1952)); *see also Bilski v. Kappos*, 561 U.S. 593, 602 (2010) ("The §101 patent-eligibility inquiry is only a threshold test. . . . the claimed invention must also satisfy 'the conditions and requirements of this title.'").

Further, the Supreme Court has only addressed the eligibility of an issued patent in three cases arising from litigation: *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012); *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 132 S. Ct. 1794 (2012); and *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). These decisions, however, are not binding because they do not address whether a district court has jurisdiction to decide an eligibility challenge. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 63 (1989) (citing *Hagans v.*

24

*Lavine*, 415 U.S. 528, 535 n. 5 (1974)) ("[T]his Court has never considered itself bound by [prior *sub silentio* holdings] when a subsequent case finally brings the jurisdictional issue before us."). By assuming that it had jurisdiction over GoDaddy's eligibility challenge simply because the Supreme Court has issued eligibility rulings in cases arising from litigation that do not address the jurisdictional issue, the district court erred. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having so decided as to constitute precedents.").

### 5.    The Court has never held that ineligibility is a litigation defense.

The district court's view that this Court has long held that §282's defenses include ineligibility is also incorrect. Appx7. To support this view, the district court cited footnote 3 from this Court's opinions in *DealerTrack, Inc. v. Huber* and *Aristocrat v. International Game Technology*. *Id*. *DealerTrack*, however, does not hold that ineligibility is a litigation defense. Footnote 3 in *DealerTrack* is just *dictum* written in response to the dissent, which opines that it was an error for the district court not to "initially address patent invalidity issues in infringement suits in terms of the defenses provided in the statute: 'conditions of patentability,' specifically §§102 and 103." *See DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1335 (Fed. Cir. 2012) (Plager, J., dissenting). Footnote 3 of *DealerTrack* also relies on *dictum* from

25

*Aristocrat* that in turn relies on the *dictum* from *Graham* noted above, which states that utility under §101 is a condition for patentability, not eligibility.  *See DealerTrack*, 674 F.3d at 1331 n.3; *Aristocrat*, 543 F.3d at 661(citing *Graham*, 383 U.S. at 86).  Although footnote 3 of *Aristrocrat* states in *dictum* that "it is beyond question that section 101's other requirement, that the invention be directed to patentable subject matter, is also a condition for patentability," *Aristocrat* cites no authority for this statement.  *See Aristocrat*, 543 F.3d at 661 n.3; Appx7.

Moreover, the Court's more recent cases directly contradict the *dictum* in *Dealertrack* and *Aristocrat*.  For example, in *Myspace, Inc. v. GraphOn Corp.*, the Court acknowledged that Congress specified the defenses in any action involving the validity of a patent as "any ground specified in part II of this title as a condition of patentability" and named only two Patent Act sections "conditions for patentability"—§§102 and 103.  *See Myspace*, 672 F.3d at 1260; *see also CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1335 (Fed. Cir. 2013) (Rader, J., dissenting) ("[T]he Supreme Court long ago held that Section 101 is not a 'condition of patentability.'  [citing *Diehr*, 450 U.S. at 189-90] . . .  Finally, the statute does not list Section 101 among invalidity defenses to infringement.  *See* 35 U.S.C. §282 (while invalidity for failing to meet a 'condition of patentability' is among the authorized defenses, Section 101 is not a 'condition of patentability')"), *aff'd by Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 134 S. Ct. 2347 (2014).  *Myspace* also

advises that courts could avoid the "murky morass" of §101 jurisprudence by insisting that "litigants initially address patent invalidity issues in terms of the conditions of patentability defenses as the statute provides, specifically §§102, 103, and 112." *See Myspace*, 672 F.3d at 1260; *see also Research Corp.*, 627 F.3d at 868 ("[T]he Supreme Court advised that section 101 eligibility should not become a substitute for a patentability analysis related to prior art, adequate disclosure, or the other conditions and requirements of Title 35."). Although *Myspace* did not state that §101 cannot ever be raised initially in a patent case, it stated that such cases would be an "unusual and infrequent circumstance." *Id.* at 1261. Thus, even if the district court could decide eligibility, this case is not such a circumstance.

## C.     Framework for Determining Eligibility

Even if the district court had jurisdiction to decide GoDaddy's eligibility challenge, which it did not, the district court still erred by concluding that the asserted claims failed to satisfy the Supreme Court's two-part test for determining their eligibility under §101. Under §101, patent-eligible subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The judicially recognized exceptions from this provision are for "[l]aws of nature, natural phenomena, and abstract ideas." *Alice*, 134 S. Ct. at 2354 (2014). The rationale behind these exclusions is "one of pre-emption," namely a "concern that patent law not inhibit further discovery by

improperly tying up the future use of these building blocks of human ingenuity." *Id.* (quotation marks omitted). Courts, however, must "tread carefully in construing this exclusionary principle less it swallow all of patent law." *Id.* Thus, "for abstractness to invalidate a claim it *must 'exhibit itself so manifestly* as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act.'" *DealerTrack, Inc.*, 674 F.3d at 1333 (quoting *Research Corp.*, 627 F.3d at 868) (emphasis added).

The Supreme Court has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the Court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* "If not, the claims pass muster under §101." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014). Second, if the answer to the first step is "yes," then the Court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297). This step essentially asks whether the claims add an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon

the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297) (modification marks omitted).

Issued patents, such as the patents-in-suit, are entitled to a presumption of validity that applies to §101 challenges, placing a heavy burden on the party alleging that claims are patent ineligible. *CLS Bank Int'l*, 717 F.3d at 1284 (Lourie, J., concurring, joined by Dyk, Prost, Reyna, Wallach, JJ.) ("[A]s with obviousness and enablement, that presumption [of validity] applies when §101 is raised as a basis for invalidity in district court proceedings."); *id.* at 1304–05 (Rader, J., concurring-in-part and dissenting-in-part, joined by Linn, Moore, O'Malley, JJ.) ("Because we believe the presumption of validity applies to all challenges to patentability, including those under Section 101 and the exceptions thereto, we find that any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence."). To the extent that the district court considered ineligibility as an invalidity defense under §282, then GoDaddy bore the burden to prove invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011) ("We consider whether §282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does."). As explained below, the district court incorrectly concluded that GoDaddy met this burden.

**D.    The District Court Erred in Invalidating the '219 Claims under §101.**

**1.    The '219 claims are not directed to an abstract idea.**

The district court erred in concluding that the '219 claims are directed to the abstract idea of "a general method of collecting and providing information about a dispatch using a third party intermediary."  Appx15.  The district court arrived at this flawed conclusion because it improperly overgeneralized the '219 claims and disregarded their specific requirements.  Instead of beginning its analysis with the claims, the district court hunted for an abstract idea in the specification's description of the prior art: "the specification's own language details how *the general concept at the heart of the Feldbau claims* is one that has been implemented for years."  *Id.* (emphasis added).  In doing so, the district court ignored this Court's warnings not to oversimplify the claimed invention.  *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 2016 U.S. App. LEXIS 16703, at *24-25 (Fed. Cir. Sep. 13, 2016) ("We have previously cautioned that courts "must be careful to avoid oversimplifying the claims" by looking at them generally and failing to account for the specific requirements of the claims.") (citing *In re TLI Commus. LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016).  This error virtually ensured that the district court would find the '219 claims directed to an abstract idea.  *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the

30

exceptions to §101 swallow the rule."); *cf. Diehr*, 450 U.S. at 189 n.12 (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious").

Contrary to what the district court found, the '219 claims do not "simply recite conventional and generic technology to perform 'generalized steps' in a well-known computer environment." Appx16. Rather, the claims are directed to a specific implementation of a solution to a problem in systems for transmitting electronic information. *See Enfish*, 822 F.3d at 1339. Specifically, the '219 claims address the problem of proving that specific information has been sent at a specific time to a specific receiving party. Appx5985, 1:31-33. The claimed solution improves the capacity of conventional systems and methods for transmitting electronic information by providing the sender with evidence that the sender can use to prove both the dispatch and its contents. Appx5985, 2:57-61.

The '219 claims do not claim any evidence for this purpose, but rather a specific type of evidence termed "authentication data." The district court erroneously stated that the '219 claims fail to explain what comprises the authentication data. Appx20. Rather, the district court construed "authentication data" to require three specific elements relating to the content, the time of successful transmission, and the destination of the dispatch. Appx4694.

31

In addition, the specific implementation claimed by the '219 claims requires an "authenticator." Appx5986, 3:1-2. Contrary to what the district court stated, authenticator is not undefined-the district court defined authenticator to mean "a sub-system that operates to authenticate a dispatch." Appx4700. The '219 claims also require that the authenticator function as a "non-interested third party." Appx5986, 3:1-2. This limitation is significant because an interested third party could potentially comprise the authentication data. Appx5986, 4:16-29. Thus, the district court construed this limitation to require the authenticator carry out the authentication function "without bias and without the participation of the sender or the recipient." Appx4700. The district court, however, failed to appreciate or even address the special role that the authenticator plays in the claims.

Further, the district court ignored the securing limitation of the authenticator. Appx5986, 3:8-10. In construing the securing function in claim 82, the district court determined that it "cannot be implemented by a general purpose computer but instead must be implemented in a special purpose computer." Appx4806. The securing step in the '219 claims recites the same function and therefore further defines a specific implementation of the authenticator. *See Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002) ("A claim term used in multiple claims should be construed consistently.")

32

Moreover, the claims further require that the securing step or the associating step be performed by mathematical association. Appx5986, 3:11-14. The district court misinterpreted RPost's argument that the '219 claims do not require "pure math." Appx16. GoDaddy coined this catchy phrase to give the illusion that the '219 patent claims a mathematical equation. It does not. Rather, the mathematical association limitation defines how the authenticator associates or secures the authentication data. Appx5986, 3:11-14. In other words, like in *Enfish v. Microsoft Corp.*, the Court is "not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation." *See Enfish*, 822 F.3d at 1339. The district court's observation that the claim do not detail the type of mathematical association is immaterial because that is a question of claim scope, not eligibility. *See BASCOM*, 2016 U.S. App. LEXIS 11687, at \*32 (Newman, J., concurring) ("Claims that are imprecise or that read on prior art or that are unsupported by description or that are not enabled raise questions of patentability, not eligibility.").

Conversely, the district court focused much of its analysis on whether the '219 claims cover a manual embodiment. Appx18-19. But the '219 patent plainly distinguishes between the clerk (manual) embodiment shown in Figure 1 and the authenticator (electronic) embodiments shown in Figure 2-7. Appx5986, 4:45-62. Not only does Figure 1 show humans 10 and 20 and not authenticator 70 as shown

in Figure 2, but the description of Figure 1 does not use the word "authenticator" at all.    Appx18-19;  Appx5986,  4:66-5:50.    Rather,  the  specification  describes authenticator  70  as  part  of  a  data  communications  system  for  transmitting information by electronic means and as comprising electronic components, such as input unit 72, output unit 58, storage unit 54, and controller 56.  Appx5987, 6:31-8:40.

Moreover,  during  the  prosecution  of  the  '219  claims,  the  applicants disclaimed the manual embodiment.  Before the first office action, the independent '219 claims did not recite an authenticator.  Appx7549-7570.  In light of a prior art rejection, the applicants amended each independent claim to require, among other things, "an authenticator functioning as a non-interested third party with respect to the sender and the recipient."  Appx7413-7431.  The claim issued with this limitation and therefore encompass only the electronic embodiment.

Finally, the district court failed to perform any inquiry into whether the '219 claims pose any risk of preemption.  Preemption is the primary concern that drives the abstract idea exception to patent eligibility.  *See Alice*, 134 S. Ct. at 2354 ("We have described  the  concern  that  drives  this  exclusionary  principle  as  one  of  pre-emption.").  In assessing the preemption risk, the Court recently held that it must "look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that

itself is the abstract idea and merely invoke generic processes and machinery." *See McRO*, 2016 U.S. App. LEXIS 16703, at *28. As detailed above, the '219 claims are directed to a specific method that improves the ability of conventional data transmission systems to provide proof of a dispatch and its contents. Accordingly, the '219 claims pose no risk of preemption and are not directed to an abstract idea.

## 2.    The '219 claims recite an inventive concept.

Even if the district court properly characterized the '219 claims, which it did not, the district court's judgment must still be reversed because the district court improperly determined that '219 claims do not recite an inventive concept.

The district court's step two analysis of the '219 claims addresses concepts that have nothing to do with eligibility. The district court's remarks that the mathematical association method is undefined and that the '219 claims do not detail the type of mathematical association performed are immaterial. These purported deficiencies are issues of definiteness and claim scope, not eligibility. *See BASCOM*, 2016 U.S. App. LEXIS 11687, at *32 (Newman, J., concurring). It is also immaterial that the '219 claims allegedly do not explain how the content data is associated with the dispatch record data. This remark also concerns definiteness, not eligibility. *Id.*

The district court also misunderstood the authenticator, which it mistakenly believed was undefined. The district court found that the specification describes the

authenticator as encompassing "all types of apparatus" capable of performing the associating and securing function. Appx21. But this fact does not detract from the "something more" that the authenticator adds to the '219 claims. Not only is what type of apparatus the authenticator is a question of claim scope, but the fact that the specification describes the authenticator as an apparatus underscores the district court's mistaken belief that the '219 claims are directed to a manual embodiment. Moreover, the district court overlooked that it expressly found that the securing function must be performed by a special purpose computer. Appx4806. The authenticator performs the securing in the '219 claims and therefore must include a special purpose computer. Thus, the '219 claims require a particular machine, which is an "important and useful clue" that they embody patent-eligible subject matter. *See Bilski*, 130 S. Ct. at 3227.

More importantly, the authenticator adds something more to the alleged abstract idea. The authenticator functions as a non-interested third party with respect to the sender and the recipient. This characteristic is critical because the authenticator must ensure that the authentication data is "provided and associated in a reliable manner" and is "secured against fraudulent actions such as disassociation, modification, replacement etc., attempted by an interested party such as the sending or receiving party . . . ." Appx5986, 4:25-28. By securing the authentication data against tampering, the authenticator transforms this data from data that is tamperable

36

to data that is non tamperable. Thus, the nature and function of the authenticator embodies the inventive concept of the '219 claims, which is to provide reliable evidence of the dispatch and its contents. Appx5986, 3:57-61.

The district court also misapplied step two by finding that the "associating" and "securing" functions are well-understood, routine, conventional activities previously known to the industry. The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. *See BASCOM*, 2016 U.S. App. LEXIS 11687, at *20-21. Regardless, the district court should have recognized that "securing" is not a generic computer function, but rather must be performed by a special purpose computer. Appx4806.

The district court should have also looked at the claims as a whole as well as the individual claim elements to determine whether the claims contain "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *See McRO*, 2016 U.S. App. LEXIS 16703, at *23 (citing *Alice*, 134 S. Ct. at 2355) (quoting *Mayo*, 132 S. Ct. at 1294) (alteration in original)). Contrary to what the district court found, the '219 claims do not merely convert input information (dispatch time, dispatch contents, and dispatch destination) to output information (authentication data). The claims require that the authenticator associate these alleged inputs or secure the authentication data by mathematical association. The

authentication data must also be secured against tampering of the sender and recipient by a special purpose computer, which is the authenticator. The authenticator must further function without bias and without participation of the sender or the recipient to ensure that the claimed methods generates reliable evidence of the dispatch and its contents. This combination of features, which the district court ignored, adds significantly more to the alleged abstract idea and renders the '219 claims patent eligible. *Id.*

## E.    The District Court Erred in Invalidating the '913 Claims under §101.

### 1.    The '913 claims are not directed to an abstract idea.

The district court erroneously concluded that the '913 claims are directed to the abstract idea of "collecting information about the delivery of a message." Appx25. As with the '219 claims, the district court overgeneralized the '913 claims and improperly applied step one. The district court's belief that "[t]he 'heart' of a patent is determinative for *Alice* step one" is mistaken. Appx26. Neither the Supreme Court nor this Court have ever articulated such a test. "Rather, the 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter." *See Enfish*, 822 F.3d at 1335 (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

Here, the '913 claims are not directed to any form of collecting information about the delivery of a message. The '913 claims are directed to providing verifiable proof of the delivery of an email that does not require the recipient cooperation or special email software. Appx5740, 1:21-24, 2:64-3:4.

The district court's belief that the '913 claims carry out the alleged abstract idea in a generic environment without special email software further shows it missed the point of the invention. Appx27. As this Court recently recognized, the use of generic computing components does not doom the claims. *See Enfish*, 822 F.3d at 1338. This rationale is particularly applicable to this case. As the specification states, the problem with prior art email systems that provide proof of delivery is that they require proprietary email clients or web browser plug-ins. Appx5740, 2:57-63. Such systems are undesirable because they require the sender and the recipient to use the same email client. *Id.* Thus, the claimed solution's ability to provide proof of delivery without special or additional software is part of the improvement over the prior art, not evidence of an abstract idea. *See Enfish,* 822 F.3d at 1335 ("'improv[ing] an existing technological process' might not succumb to the abstract idea exception") (citing *Alice*, 134 S. Ct. at 2358-59); *Research Corp.*, 627 F.3d at 869 ("[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act.").

The '913 claims are also not the electronic version of certified or registered mail.  In making this comparison, the district court falsely assumed that postal mail and other hard copy mail delivery are the same as email.  They are not.  Certified mail and registered mail are two distinct services and each is distinct from email.  Appx6231, n. 120.  Certified mail provides proof of mailing of hard copy documents, not proof of email delivery.  *Id.*  Registered mail provides end-to-end delivery of hard copy documents in locked containers, which is not how emails are delivered.  *Id.*; Appx6240-6241, ¶9.  Although one of the goals of the Tomkow patents is to give email legal status comparable or greater than registered mail, that does not mean that the Tomkow patents claim an electronic version of certified mail or registered mail.  The Tomkow patents expressly state that it is not necessary any legal status be accorded to emails sent using the claimed inventions.  Appx571, 3:11-17.  In fact, the district court expressly rejected GoDaddy's attempt to limit several of the disputed claim terms in this way.  Appx4726; Appx4728-4729; Appx4731-4732; Appx4739-4742; Appx4745; Appx4757-4758.  Thus, the district court's conclusion that the heart of the '913 claims is directed to a conventional business practice long prevalent in our system of commerce not only conflicts with its claim construction order, but is erroneous.

Furthermore, the '913 claims do not recite generalized steps to be performed on a computer using conventional computer activity.  At the time of the invention,

recording the portion of the SMTP and ESMTP dialog in which the recipient's MTA accepts or declines the delivery of the transmitted message was hardly a conventional activity of an email server. Appx5753, 27:48-54. In fact, RPost submitted evidence through its expert, Dr. Jonathan L. Krein, that it was not known to record or store a portion of an SMTP or ESMTP dialog. Appx6239-6244, ¶¶12-14. Dr. Tomkow also testified that the practice of recording a portion of an SMTP dialog for the purpose of documenting message delivery, as required by claim 2, was entirely unknown. Appx6009-6010, 159:20-160:15. Not only did the district court not consider this evidence, the district court performed no analysis of the character of the claims as a whole, other than hastily concluding that they are directed to collecting information about the delivery of a message. This error, along with the errors mentioned above, merit reversal.

## 2.  The '913 claims recite an inventive concept.

The district court's finding that the '913 claims do not recite an inventive concept should also be reversed. To say, as the district court did, that the '913 claims invoke three functions—"transmitting," "recording," and "storing"—that can be implemented by nearly every computer proves nothing. Appx28. Just because the '913 claims use common computer functions to introduce steps being performed at an intermediate server does not mean that the '913 claims fail to recite an inventive concept. As the Court has held, an inventive concept may lie "in the non-

conventional and non-generic arrangement of known conventional pieces." *See BASCOM*, 2016 U.S. App. LEXIS 11687, at *21. Although SMTP and ESMTP are used to transmit emails, as explained above, the recording and storing of a portion of an SMTP or ESMTP protocol dialog at an intermediate server adds to conventional email systems steps that were not previously known in the art. Appx6241-6243, ¶¶12-14, Appx6009-6010, 159:20-160:15.

Moreover, recording and storing a portion of an SMTP or ESMTP protocol dialog by an intermediate server is a technical solution to the technical problem of proving email delivery. *See DDR Holdings, L.P.*, 773 F.3d at 1257-58. Contrary to what the district court found, it is of consequence that the '913 claims concern email. Because of its form, email presents unique challenges for establishing proof of delivery that do not exist in hard copy mail delivery systems. Appx7076-7077. One such challenge is proving email delivery without special or additional software as discussed above. One of the other drawbacks of prior art email systems that provide proof of delivery is that they require the recipient to collect their messages from a third party service without any assurance that the recipient would cooperate in receiving the email. Appx5740, 2:21-45. By recording a portion of the SMTP or ESMTP dialog between an intermediate server and the recipient's MTA, the '913 claims provide a technical solution to providing proof of email delivery without the cooperation of the recipient.

42

Notably, the district court in the *Sophos* cases agreed that the '913 claims use of the intermediate server provides a technical solution to establishing proof of email delivery and thus satisfy step two.  Appx7077.  RPost also presented the same arguments to the PTAB in response to a petition to institute CBM review of the '913 patent.  Even under the preponderance of the evidence standard applied by the PTAB, the petitioner could not overcome RPost's arguments that the intermediate server provides a technical solution and that the '913 patent claims a technological invention.  Appx6345-6347.  Both of these decisions support the conclusion that the '913 claims recite an inventive concept. Appx7077, n. 6.

Finally, the notion that collecting delivery information about a message has been practiced in various forms further highlights the flaws of the district court's analysis.  Appx25.  The '913 claims are not designed to monopolize all forms of collecting delivery information about a message and thus pose no risk of preemption. *See Alice*, 134 S. Ct. at 2357.  Rather, they claim only one way of documenting the delivery history of an email—recording and storing portions of the SMTP or ESMTP protocol dialog between an intermediate server and a receiving MTA.  Thus, when properly viewed as a whole, the '913 claims recite an inventive concept and therefore are patent eligible.

**F.    The District Court Erred in Invalidating the '104 Claims under §101.**

    **1.    The '104 claims are not directed to an abstract idea.**

The district court also erroneously concluded that the '104 claims are directed to the abstract idea of "collecting and providing information about the opening of a message." Appx32.  The district court again applied its improper heart-of-the-patent test but this time it did not state what it believed the heart of the '104 claims is.  *Id.* Consequently, the district court oversimplified the '104 claims and ignored significant limitations that take them out of the realm of an abstract idea.  *McRO*, 2016 U.S. App. LEXIS 16703, at *24-25 ("We have previously cautioned that courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.") (citations omitted).

The '104 claims do not merely involve adding links to electronic messages that provide read notifications when activated at the recipient.  As the specification points out, such prior art read notifications may be altered or forged.  Appx5589, 2:9-14.   Rather, the '104 claims also require that the claimed server create "authenticable information," which the district court construed to be "information unique to the content and delivery of the message that can be verified." Appx5602, 28:10-12; Appx4687.  The authenticable information may include the indication of opening (claim 1), which must also be verifiable, or be transmitted with the

44

indication of opening in a secure and verifiable manner (claim 32).  Appx4683.
Either way, the '104 claims are not merely directed to collecting and providing any
information about email opening, they are directed to a specific implementation for
providing verifiable proof of email opening.

Finally, the district court agreed that the '104 claims are directed to proving
opening in its claim construction order: "the '104 patent claims a system and method
for verifying, i.e., proving, the opening of a message and the message's contents."
Appx4715.  The district court also detailed how the '104 claims are directed to a
two-step verification process, which it found essential to understanding the Tomkow
patents.  Appx4715-4716; Appx4718 ("The intrinsic record conveys that the primary
purpose of the invention is to provide information regarding the delivery, opening,
and content of an electronic message that *can be* 'verified'.") (emphasis in original).
The district court, however, never mentioned its narrower understanding of the '104
claims in its step one analysis and consequently incorrectly concluded that they are
directed to an abstract idea.

## 2.    The '104 claims recite an inventive concept.

Even if the Court accepts the district court's flawed reasoning that the '104
claims are directed to an abstract idea, they still fit what the Court deems to be an
inventive concept.  *See DDR Holdings*, 773 F.3d. at 1259.

Contrary to what the district court found, the problem of proving email opening was not prevalent in the pre-Internet, analog world—it did not exist in that world. Appx35. Accordingly, technical solutions were developed specific to email to provide a form of proof of delivery or opening, such as request for notification tags. Appx5589, 1:41-62. But as noted above, such prior art notifications may be altered or forged. *Id.*, 2:11-14. The '104 patent claims a specific technical way to improve upon the prior art by providing verifiable proof of email opening.

Specifically, the '104 patent claims an intermediate server displaced from the recipient that creates "authentication information"—information unique to the content and delivery of the message that must be able to be verified using the Tomkow patents' two-step verification process. Appx4735. In claim 1, the authentication information includes the indication of opening and therefore the indication must also be verifiable. Appx4718, Appx5602, 28:11-16. The district court erroneously concluded that the authentication information does not include the indication because it construed the claim that way. *Compare* Appx38, n.19 *with* Appx4718. In both claims 1 and 27, the server transmits the authentication information and the indication of opening to the sender, which provides the sender verifiable evidence of opening. Appx5602, 28:11-16; Appx5603, 29:33-37. This step is not part of conventional email transmissions and was not part of prior art solutions.

The '104 claim's technical solution fully fits what the Court deemed inventive in *DDR Holdings v. Hotels.com*. The claimed solution—providing verifiable proof of email opening through an intermediate server—is necessarily rooted in computer technology—email—in order to overcome a problem specifically arising in the realm of computer networks—the lack of sufficient forms of proof due to the alterability and forgeability of prior art email delivery notifications. *DDR Holdings*, 773 F.3d at 1257. Like the '913 patent, the PTAB's decision not to institute CBM review of the '104 patent supports this conclusion. Appx6319-6323.

The '104 claims provide the additional benefit of not requiring the recipient cooperation and not requiring special email software. Appx5589, 2:62-3:2. The district court's finding that the '104 claims employ generic, pre-existing computer steps and components does not detract from the '104 claims' inventiveness. The inventive concept inquiry requires more than finding that individual claim elements were known in the art. *See BASCOM*, 2016 U.S. App. LEXIS 11687, at *21. An inventive concept may lie "in the non-conventional and non-generic arrangement of known conventional pieces." *Id.* Thus, the district court's invalidity judgment must be reversed.

## G.    The District Court Erred in Invalidating the '198 Claims under §101.

### 1.    The '198 claims are not directed to an abstract idea.

The district court erred in concluding that the '198 claims are directed to the abstract idea of "collecting and providing information about the opening and delivery of a message." Appx42. Although the '198 patent is a continuation of the '104 patent, and therefore has similar claims, the district court incorrectly found that there is no practical difference between the '104 and '198 claims on the one hand and the '913 claims on the other hand. The '104 and '198 claims are directed to providing proof of opening or delivery of an email using authenticable information and a link that provides a verifiable indication that the email has been opened or delivered. The '913 claims, however, provide proof of email delivery by recording a portion of the SMTP or ESMTP dialog exchanged between devices during the transmission of an email. This distinction is significant because the Tomkow patents themselves demonstrate that they are not directed to any method of proving email delivery. Rather, they claim specific implementations of proving email opening or delivery. As such, the Tomkow patents, including the '198 patent, do not implicate the preemption concerns of the abstract idea exception to patent eligibility. *See McRO*, 2016 U.S. App. LEXIS 16703, at *27. For this reason and the same reasons discussed regarding the '104 claims, the '198 claims are not directed to an abstract idea.

## 2.    The '198 claims recite an inventive concept.

The district court also erred in determining that the '198 claims do not recite an inventive concept.  As with the '104 claims, the district court failed to consider the '198 claims as an ordered combination in light of its own claim construction.  Consequently, the district court failed to recognize that the '198 patent claims a specific technical solution for providing verifiable proof of the delivery and opening of an email without requiring recipient cooperation and without special email software.  Appx5627, 2:65-3:5.  In this way, like the '104 claims, the '198 patent claims a technical improvement upon prior art delivery notifications, thereby reciting an inventive concept.  *Id.*, 2:12-17; *see DDR Holdings*, 773 F.3d at 1257.

The district court's step two reasoning was flawed because the district court again focused on features of the '198 claims that are not determinative of an inventive concept.  The district court's finding that the '198 claims recite functions that can be performed by a computer means nothing—email is a computer technology, so of course the '198 claims recite functions that can be performed by a computer.  The district court failed to recognize, however, that, at the time of the invention, the step of transmitting to an email sender authenticable and verifiable information regarding the delivery and opening of the email was not a conventional step.  Appx5627, 2:12-17.  Also, the district court's finding that the '198 claims recite a link that executes when activated at the recipient but do not recite when or

how the link is activated concerns definiteness, not eligibility, and therefore is not indicative of a lack of an inventive concept. Because the district court failed to identify any additional and legitimate reasons why the '198 claims do not recite an inventive concept, the same reasons why the '104 claims recite an inventive concept apply equally to the '198 claims.

## H.    The District Court Erred in Invalidating the '389 Claims under §101.

### 1.    The '389 claims are not directed to an abstract idea.

The district court incorrectly concluded that "the heart of '389 Patent Claims is the general concept of collecting and providing information about a particular message." Appx45. Again, the district court improperly applied its own heart-of-the-patent test and improperly overgeneralized the claims. *See McRO*, 2016 U.S. App. LEXIS 16703, at *24-25. In doing so, the district court failed to account for the specific requirements of the '389 claims that show that they are not directed to an abstract idea.

The '389 claims are not merely directed to the collecting a providing information about a particular message; they are directed to verifying the delivery of an email. Like the '913 claims, the '389 claims employ an intermediate server displaced from the recipient that receives a portion of the mail transport protocol dialog during the transmission of the email from the server to the recipient. Appx5717, 28:58-67. The step was not conventional or known in prior art email

systems.  Appx6241-6243, ¶¶12-14; Appx6009-6010, 159:20-160:15.  In addition, the server receives from the recipient an indication of receipt of the message, which the district court construed to mean "verifiable information that indicates that the message was received by the recipient."  Appx5717, 28:58-67; Appx4684.  The server forms a first information from the captured dialog and indication of receipt. The server may transmit the first information to the sender along with a copy of the message (claim 1) or it may store the first information along with a representation of the message (claim 14).  Appx5717, 28:1-7; Appx5718, 30:6-8.  Through this ordered combination of steps, the '389 claims provide proof of email delivery without recipient cooperation and without special software, unlike the prior art. Appx5704, 2:62-3:2.  As such, the '389 patent claims a specific technical solution that overcomes the challenges of prior art proof of email delivery systems, not an abstract idea.  *See Enfish*, 822 F.3d at 1335.

### 2.  The '389 claims recite an inventive concept.

Irrespective of whether '389 claims are directed to an abstract idea, which they are not, the '389 claims recite an inventive concept.  The district court erroneously concluded that the '389 patent is not directed to a problem specifically arising in the realm of computer technology.  Proving delivery of an email is a problem specific to email.  Appx7076-7077.  The specification details the prior attempts to solve this problem and why those solutions were inadequate.  Appx5704-

5705, 2:15-3:2. Just because an allegedly analogous problem existed in the pre-email, analog world does not mean that the problems that the '389 claims address are not unique to email. Moreover, the '389 claims do not invoke computers to solve a problem in the pre-email world, they invoke computers to solve a problem in the email world.

Further, the district court did not address RPost's argument that the '389 claims recite a technical solution to the problem of providing verifiable evidence of email delivery. The claimed solution requires an intermediate server displaced from either a sender or a recipient of an email. Appx5717, 27:58-60, 28:37-39; Appx5718, 29:17-19. The server receives at least a portion of the mail transport protocol dialog generated during transmission of the message from the server to the recipient and a verifiable indication of receipt of the message. Appx5717, 27:63-67, 28:42-46; Appx5718, 30:1-5. As such, the claimed arrangement provides a technical way of providing verifiable evidence that an email was delivered without the sender or recipient doing anything other than use the claimed server to relay the email. *See DDR Holdings*, 773 F.3d at 1257-1259; Appx5704-5705, 2:15-3:2. Like the '913 claims, both the denial of Sophos's motion for judgment on the pleadings under §101 and the PTAB's denial of a petition to institute CBM review regarding the '389 patent support this conclusion. Appx7077, n.6; Appx6332-6335.

By saying that it is well-settled that the receiving and transmitting steps are conventional computer activities, the district court improperly took these claim terms out of context and ignored the rest of the limitations of the '389 claims. *See McRO*, 2016 U.S. App. LEXIS 16703, at *25 ("[I]n determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps."). The '389 claims do not merely receive and transmit information. Receiving a portion of a mail transport protocol dialog, forming new information from the portion and other verifiable information regarding email delivery, and transmitting the new information to the sender are not conventional steps in an email transmission system. Appx6241-6243, ¶¶12-14; Appx6009-6010, 159:20-160:15. They are ordered steps designed to address a specific problem—providing the sender verifiable evidence of email delivery.

The district court also improperly analyzed the forming step. Again, how the forming is done concerns definitiveness, not eligibility. Also by forming a first information, the '389 claims do not seek to patent the information or its inputs. Appx46. Rather, as discussed above, the '389 claims patent a specific system and method, including forming a first information, for providing verifiable evidence of email delivery. Thus, the district court's finding that the '389 claims do not recite an inventive concept was erroneous and should be reversed.

## I.    The District Court Erred in Invalidating the '199 Claims under §101.

### 1.    The '199 claims are not directed to an abstract idea.

The district court erroneously concluded that the '199 claims are directed to the abstract idea of "collecting and providing information that a message was not delivered." As with the '389 claims, the district court incorrectly framed the problem addressed by the '199 claims. The '199 claims are not directed to a problem in the pre-email, analog world where a computer is used as a tool to solve the problem. The '199 claims are directed to a problem in the email world where previous computer solutions did not solve the problem—the lack of verifiable evidence of email non-delivery. Appx5664, 2:11-16. The '199 claims employ the same technical solution to this problem as the '389 claims except that instead of receiving an indication of receipt, the intermediate server receives an indication of the failure to deliver the message. Appx5677, 27:66-67. Thus, for at least the same reasons as the '389 claims, the '199 claims are not directed to an abstract idea.

The district court also incorrectly found that "the concept of providing information that an electronic message failed to be delivered has been implemented by standard SMTP 'bounce' codes for dozens of years." Appx48. RPost submitted evidence that SMTP codes simply provide a mechanism for a recipient MTA to acknowledge success or failure in responses to a sending MTA's commands, such as after a DATA transmission step. Appx6242, ¶13. The concept of recording and

storing these codes was not known in the prior art at the time of the '199 patent. *Id.*, ¶14. The district court ignored this evidence and thus reached the erroneous conclusion that the '199 claims are directed to an abstract idea.

### 2.    The '199 claims recite an inventive concept.

Even assuming that the '199 claims are directed to an abstract idea, which they are not, the '199 claims recite an inventive concept for the same reasons that the '389 recite an inventive concept. Specifically, the '199 claims recite a technical solution—an intermediate server displaced from the recipient that receives a portion of a data transport protocol dialog and an indication of failure to deliver a message—to solve a technical problem—providing reliable proof of content and delivery of an email. *See DDR Holdings*, 773 F.3d at 1257. The denial of the motion for judgment on the pleadings in the *Sophos* cases supports this point. Appx7077. The '199 claims improve upon the prior art because they describe a particular way to provide evidence of non-delivery that does not require the cooperation of the recipient or special email software. *See BASCOM*, 2016 U.S. App. LEXIS 11687, at *23; Appx5664, 2:64-3:4.

The district court's analysis under step two is flawed for several reasons. First, the statement "at the heart of the '199 Patent Claims is a method 'for which computers are invoked merely as a tool'" is erroneous. Appx48. Not only does a heart-of-the-patent test not exist, but the '199 claims do not invoke computers

merely as a tool; they recite an improved way for computers to provide proof of email non-delivery over the prior art.  Second, the statement "[t]here is nothing new about the concept of providing information that a message was not delivered" is also erroneous.  Not only is novelty not an appropriate consideration under step two, but, as discussed above, recording and storing a portion of a protocol dialog during an email transmission were not known.  *See BASCOM*, 2016 U.S. App. LEXIS 11687, at *20-21; Appx6242, ¶13.  Thus, like the '389 claims, the '199 claims do not recite conventional email transmission steps.   Because the district court incorrectly concluded that the '199 claims do not recite an inventive concept, its judgment of invalidity of these claims must be reversed.

## J.    The District Court Erred in Exercising Subject-Matter Jurisdiction over the '219 Patent.

Under the Declaratory Judgment Act, a district court has subject-matter jurisdiction over a declaratory judgment claim if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  Specifically, "declaratory judgment jurisdiction will not arise merely on the basis that a party learns of the existence of an adversely held patent, or even perceives that such a patent poses a risk of infringement, in the absence of some

56

affirmative act by the patentee" directed at the plaintiffs regarding infringement of the patent at issue. *See Ass'n for Molecular Pathology v. USPTO*, 653 F.3d 1329, 1344, 1348 (Fed. Cir. 2011). RPost made no such affirmative act toward GoDaddy regarding the '219 patent. Therefore, the district court improperly held that it had subject-matter jurisdiction over GoDaddy's declaratory judgment claim of invalidity of the '219 patent.

Because the district court entered a final judgment disposing of the case, the interlocutory issue of whether the district court lacked subject-matter jurisdiction over the '219 patent merges into the final judgment and is appealable. *See, e.g.,* *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1069 (Fed. Cir. 2005) (citing *Hendler v. United States*, 952 F.2d 1364, 1368 (Fed. Cir. 1991)).

**1.    The district court erroneously found that RPost took an affirmative act regarding the '219 patent.**

Unlike the Tomkow patents, which RPost provided GoDaddy with detailed claim charts demonstrating GoDaddy's infringement, RPost merely listed the Feldbau patents among many other RPost patents in its pre-suit communications. Appx164-166; Appx168-176; Appx1279. No RPost pre-suit communication contained an analysis of the Feldbau patents, nor did any RPost pre-suit communication accuse GoDaddy of infringing the Feldbau patents or threaten GoDaddy with litigation regarding the Feldbau patents. *Id.* The district court granted RPost's motion regarding the '334 patent and recognized that, "[s]imply

listing a patent among numerous other patents in pre-suit communications from a patent owner to a potential infringer is insufficient to establish a justiciable controversy." Appx2376. Yet the district court improperly held that it had subject-matter jurisdiction over the '219 patent, despite the fact that RPost never specifically directed GoDaddy to the '219 patent outside of mere patent lists. Appx2382.

The only distinction between RPost's pre-suit acts toward GoDaddy regarding the two Feldbau patents was that RPost listed the '219 patent, among others, under the heading "Additional Recommended Review" on the title page of a presentation analyzing GoDaddy's infringement of the Tomkow patents. Appx1279. RPost's oblique, passing reference to one claim of the '219 patent on the presentation cover page did little more than flag the '219 patent as a potential topic for future discussions. The district court even acknowledged that this act alone may not be enough to establish subject-matter jurisdiction. Appx2379.

Because RPost's listing of the '219 patent did not constitute an affirmative act toward GoDaddy, the district court incorrectly considered RPost's litigation history in finding that it had subject-matter jurisdiction. While prior litigation is a circumstance to be considered in assessing the totality of circumstances, the fact that RPost had filed infringement suits against other parties for other products does not, in the absence of any affirmative act directed toward GoDaddy, meet the minimum standard discussed in *MedImmune*. *See Innovative Therapies, Inc. v. Kinetic*

*Concepts, Inc.*, 599 F.3d 1377, 1382 (Fed. Cir. 2010) (citing *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008). Thus, the district court improperly factored RPost's litigation history in its jurisdictional analysis because it still needed to find an affirmative act, which the listing of the '219 patent was not.

The district court also improperly factored RPost's refusal to grant GoDaddy a covenant not to sue on the '219 patent in its analysis. Critically, GoDaddy initiated the discussion when it demanded from RPost a covenant not to sue on the '219 patent—which RPost had not threatened to assert—in exchange for GoDaddy dropping its original counts against RPI and RMail, neither of which were proper parties to the case based on the Original Complaint. Appx1802-1804. As this Court has made clear, "refusal to grant a covenant not to sue 'is not sufficient to create an actual controversy' because 'a patentee has no obligation . . . to make a definitive determination, at the time and place of the competitors' choosing, that it will never bring an infringement suit.'" *Microsoft*, 755 F.3d at 906 (quoting *Prasco*, 537 F.3d at 1341). Moreover, the only discussions between the parties regarding a covenant not to sue occurred one month after GoDaddy filed its Original Complaint. Appx1802-1804. Post-complaint facts cannot create jurisdiction where none existed at the time of filing. *Id.* (citing *Innovative Therapies*, 599 F.3d at 1383-84). Thus, the district court's reliance on RPost's refusal to grant a covenant not to sue was erroneous.

Finally, neither RPost's litigation history nor its refusal to grant a covenant not to sue can substitute for the absence of an affirmative act regarding the '219 patent toward GoDaddy.  Because no "substantial controversy . . . of sufficient immediacy and reality" existed when GoDaddy filed its Original or its First Amended Complaint, the district court lacked subject-matter jurisdiction over the '219 patent.

## VI.    CONCLUSION

In conclusion, RPost respectfully requests that the Court vacate the judgement of invalidity of the '219 patent because the district court lacked subject-matter jurisdiction.  Additionally, RPost requests that the Court reverse the judgment and the order granting GoDaddy summary judgment of invalidity under §101 because the district court lacked jurisdiction to decide GoDaddy's eligibility challenge and erroneously concluded that the patents-in-suit are not patent eligible.  Accordingly, the Court should remand this case to the district court for further proceedings.

Dated: September 26, 2016                   Respectfully submitted,

                                            Hudnell Law Group P.C.

                                            By:    /s/ Lewis E. Hudnell, III
                                                   Lewis E. Hudnell, III

                                            Attorneys for Defendants-Appellants
                                            RPost Communications Limited
                                            RPost Holdings, Inc.
                                            RPost International Limited
                                            RMail Limited

# ADDENDUM

1     **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE DISTRICT OF ARIZONA**

8

9     GoDaddy.com LLC,                 No. CV-14-00126-PHX-JAT

10              Plaintiff,             **ORDER**

11     v.

12     RPost Communications Limited, et al.,

13             Defendants.

14

15       Pending before the Court are Plaintiff GoDaddy.com LLC ("GoDaddy")'s Motion

16 for Summary Judgment, (Doc. 257), and Defendants'[1] Motion for Summary Judgment on

17 Plaintiff's Count I (Fraudulent Misrepresentation of Patent Ownership), (Doc. 284). The

18 Court now rules on the motions.

19     **I.**      **Background**

20       After multiple rounds of motions to dismiss, briefing for a three-month stay,

21 complete *Markman* review, a *Daubert* motion, and dozens of other motions, the factual

22 background of this case is well-established. In short, GoDaddy filed this Declaratory

23 Judgment Action against RPost, seeking, among other things, damages for fraudulent

24 misrepresentation and declarations of invalidity and non-infringement of various patents

25 (the "Asserted Patents")[2] after RPost attempted to enforce those patents against

26 _____

27     [1] Defendants are RPost Communications Ltd.; RPost Holdings, Inc.; RPost
International Ltd.; and RMail Ltd. Defendants are collectively referred to as "RPost."

28     [2] The Asserted Patents are (1) U.S. Patent No. 8,224,913 (filed July 17, 2012) (the

1  GoDaddy. (Doc. 46 at 38). RPost counterclaimed, alleging that GoDaddy is liable for
2  direct infringement of the Asserted Patents. (Doc. 108 at 20–27).

3  **II.   Legal Standard**

4       Summary judgment is appropriate when "the movant shows that there is no
5  genuine issue as to any material fact and that the moving party is entitled to summary
6  judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be
7  or is genuinely disputed must support that assertion by "citing to particular parts of
8  materials in the record," including depositions, affidavits, interrogatory answers or other
9  materials, or by "showing that materials cited do not establish the absence or presence of
10 a genuine dispute, or that an adverse party cannot produce admissible evidence to support
11 the fact." *Id.* at 56(c)(1). Thus, summary judgment is mandated "against a party who fails
12 to make a showing sufficient to establish the existence of an element essential to that
13 party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*
14 *v. Catrett*, 477 U.S. 317, 322 (1986).

15      Initially, the movant bears the burden of pointing out to the Court the basis for the
16 motion and the elements of the causes of action upon which the non-movant will be
17 unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to
18 the non-movant to establish the existence of material fact. *Id.* The non-movant "must do
19 more than simply show that there is some metaphysical doubt as to the material facts" by
20 "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

21 ───────────────────────────────

22 "'913 Patent"); (2) U.S. Patent No. 8,209,389 (filed June 26, 2012) (the "'389 Patent");
   (3) U.S. Patent No. 8,161,104 (filed April 17, 2012) (the "'104 Patent"); (4) U.S. Patent
23 No. 8,468,198 (filed June 18, 2013) (the "'198 Patent"); (5) U.S. Patent No. 8,468,199
   (filed June 18, 2013) (the "'199 Patent"); and (6) U.S. Patent No. 6,182,219 (filed
24 January 30, 2001) (the "'219 Patent"). The '104, '389, '913, '198, and '199 Patents are
25 referred to herein as the "Tomkow Patents." The '219 Patent is referenced as the
   "Feldbau Patent."
26
27      GoDaddy's First Amended Complaint ("FAC") also included Counts for
   declarations of invalidity and non-infringement of U.S. Patent No. 6,571,334. (Doc. 46 at
28 33–34, 36–37). In a prior Order, the Court dismissed those Counts due to a lack of
   justiciable controversy. *See* (Doc. 107 at 9, 14).

- 2 -

Appx2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. Further, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury." (citations omitted)).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.* Notably, "[i]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

**III.   GoDaddy's Motion for Summary Judgment**

GoDaddy moves for summary judgment on seven issues. First, GoDaddy argues that "the asserted claims of the RPost Patents claim patent-ineligible abstract ideas and are invalid under 35 U.S.C. § 101." (Doc. 257 at 7). Second, GoDaddy contends that the '913 Patent is invalid as "obvious" under 35 U.S.C. § 103. (*Id.*) Third, GoDaddy maintains that the "earliest priority date claimable for the Tomkow Patents" is December 17, 1999. (*Id.*) Fourth, GoDaddy asserts that it has "intervening rights as to the Feldbau

- 3 -

Appx3

1   Patent." (*Id.*) Fifth, GoDaddy contends that the Accused Products[3] do not infringe the

2   asserted claims of the Tomkow Patents that recite a "copy" or "representation" of "the

3   message." (*Id.*) Sixth, GoDaddy insists that the Accused Products do not infringe the

4   asserted Feldbau Patent claims. (*Id.*) Finally, GoDaddy moves for summary judgment on

5   the issue of damages. (*Id.*)

6       **A.    Eligibility of the Asserted Patents**

7       GoDaddy contends that the Asserted Patents are invalid under 35 U.S.C. § 101

8   because they claim patent-ineligible subject matter. (Doc. 257 at 9–10). Specifically,

9   GoDaddy argues that the Asserted Patents claim "abstract ideas" lacking "inventive

10  concepts sufficient to transform the claimed abstract idea into a patent-eligible

11  application." (Doc. 257 at 10–15) (citing *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134

12  S. Ct. 2347, 2354–55 (2014) ("*Alice*")). As to the Feldbau Patent, GoDaddy argues that

13  the claims are drawn to the "abstract idea of collecting and providing information for

14  proving a message was sent to a recipient at a particular time with particular content"

15  without adding an inventive concept sufficient to confer eligibility. (*Id.* at 18). Regarding

16  the Tomkow Patents, GoDaddy contends that the claims are drawn to the abstract idea of

17  "collecting and providing information for verifying transmission and/or delivery of a

18  message" without including an inventive concept to transform that idea into a patent-

19  eligible application. (*Id.* at 14).

20      In response, RPost asserts that an eligibility challenge under § 101 is not a

21  statutory defense in patent infringement litigation and therefore the Court lacks

22  jurisdiction over GoDaddy's argument. (Doc. 299 at 8–13). According to RPost, neither

23  the Supreme Court of the United States nor the Federal Circuit has expressly held that

24  § 101 is a statutory defense. (*Id.*) RPost explains that the section heading of § 101,

25  "Inventions patentable," takes the statute out of the realm of statutory defenses

26  _____

27      [3] The "Accused Products" are GoDaddy's Express Email Marketing ("EEM"),

28  GoDaddy Email Marketing ("GEM"), and the MadMimi email marketing product
    ("MadMimi").

- 4 -

Appx4

demarcated in 35 U.S.C § 282(b). (*Id.*) In the alternative, RPost argues that the Asserted Patents are directed to patent-eligible subject matter and recite inventive concepts. (*Id.* at 13–22). Specifically, RPost contends that the Feldbau Claims provide a technical solution to a technical problem using an "authenticator." (*Id.* at 20–21). RPost further argues that the Feldbau Claims add an "inventive concept" because the invention requires a physical "transform[ation]" of the information. (*Id.* at 21–22) As to the Tomkow Patents, RPost asserts that GoDaddy's characterization of the patents is a "gross oversimplification." (*Id.* at 14). Instead, RPost insists that the asserted Tomkow Patent claims "recite specific ways to verify delivery of an electronic message using specific information." (*Id.*)

### 1.    Jurisdiction

Before reaching the merits of GoDaddy's eligibility argument, the Court must first determine whether it has jurisdiction over patent-eligibility challenges brought pursuant to § 101. According to RPost, § 101 eligibility is not an authorized statutory defense because § 101 is not listed or referenced in § 282(b), the statute designating patent litigation defenses. (Doc. 299 at 8–13). GoDaddy, on the other hand, believes that its § 101 eligibility challenge is properly before the Court due to a long litany of Federal Circuit and Supreme Court cases interpreting § 101 in the context of patent litigation. (Doc. 314 at 7–8) (citing cases). Most notably, GoDaddy points to the recent landmark decision in which the Supreme Court further refined the standards applicable to § 101 eligibility challenges in patent litigation, *Alice*. (*Id.*)

### a.    Legal Background

Section 282(b) of Title 35 of the United States Code provides an exhaustive catalogue of defenses available to an alleged infringer in an action involving the validity or infringement of a patent:

> (1) Noninfringement, absence of liability for infringement or unenforceability,
> (2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,
> (3) Invalidity of the patent or any claim in suit for failure to comply with—
>> (A) any requirement of section 112, except that the failure to

- 5 -

> disclose the best mode shall not be a basis on which any claim of a
> patent may be canceled or held invalid or otherwise unenforceable;
> or
>
> (B) any requirement of section 251.
>
> (4) Any other fact or act made a defense by this title.

§ 282(b). For purposes of this case, the pertinent provision of § 282(b) is the second section, which authorizes defenses based on "invalidity of the patent on or any claim in suit on any ground specified in part II of this title as a condition for patentability."

Part II of Title 35 encompasses §§ 100–212. Of these sections, three are relevant here: §§ 101, 102, and 103. Section 101 is entitled "Inventions patentable" and states as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." § 101. Section 102 is labeled "Conditions of patentability; novelty" while Section 103 is designated "Conditions for patentability; non-obvious subject matter." *See* §§ 102, 103.

Fifty years ago, the Supreme Court stated that,

> The [Patent] Act sets out the conditions of patentability in three sections.
> An analysis of the structure of these three sections indicates that
> patentability is dependent upon three explicit conditions: novelty and utility
> as articulated and defined in § 101 and § 102, and nonobviousness, the new
> statutory formulation, as set out in § 103.

*Graham v. John Deere Co.*, 383 U.S. 1, 12 (1966). Fifteen years after *Graham*, the Supreme Court observed that "Section 101 sets forth the subject matter that can be patented, 'subject to the conditions and requirements of this title.' The conditions under which a patent may be obtained follow [§ 101]." *Diamond v. Diehr*, 450 U.S. 175, 190 (1981) (citing S. Rep. No. 1979, 82d Cong., 2d Sess., 5 (1952); U.S. Code Cong. & Admin. News, 1952, p. 2399)). More recently, the Supreme Court explained that,

> The § 101 patent-eligibility inquiry is only a threshold test. Even if an
> invention qualifies as a process, machine, manufacture, or composition of
> matter, in order to receive the Patent Act's protection the claimed invention
> must also satisfy "the conditions and requirements of this title." § 101.
> Those requirements include that the invention be novel, *see* § 102,
> nonobvious, *see* § 103, and fully and particularly described, *see* § 112.

- 6 -

*Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Two years later, the Supreme Court identified a two-part analysis for determining § 101 eligibility in patent litigation. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296–97 (2012). Finally, in *Alice*, the Supreme Court further developed and refined the *Mayo* two-step inquiry. *See* 134 S. Ct. at 2354–55.

Similarly, although the Federal Circuit has recognized that only §§ 102 and 103 are textually "denominated" as "conditions of patentability," *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1259–60 (Fed. Cir. 2012), it has long held that § 282's defenses "include not only the 'conditions of patentability' in §§ 102 and 103, but also those in § 101," *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1330 n.3 (Fed. Cir. 2012); *see Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661, 661 n.3 (Fed. Cir. 2008) (observing that "it is beyond question that section 101's other requirement, that the invention be directed to patentable subject matter, is also a condition for patentability" but noting that "sections 102 and 103," unlike § 101, "are explicitly entitled conditions for patentability"). In other words, the Federal Circuit uniformly holds that § 101 can be raised as a defense in patent infringement litigation. *See, e.g.*, *MySpace*, 672 F.3d at 1261 (recognizing the benefits of shifting invalidity challenges towards §§ 102 and 103 but acknowledging that "Does this mean that § 101 can never be raised initially in a patent infringement suit? No.").

### b.    Analysis

Notwithstanding the complexity of RPost's argument, the Court finds that it has jurisdiction over GoDaddy's § 101 eligibility challenge. In a slightly different context, the Federal Circuit recently addressed this precise question. In *Versata Development Group, Inc. v. SAP America, Inc.*, the Federal Circuit summarized the patentee's argument as follows:

> [Covered Business Method ("CBM")] post-grant review must be limited to a ground that could be raised under paragraph (2) or (3) of section 282(b). [Patentee] then reasons that § 282(b)(2) authorizes defenses on any ground 'specified in part II as a condition for patentability,' and that the part II reference includes under the headings in the compiled statutes only

- 7 -

'conditions for patentability,' i.e., §§ 102 and 103, but not § 101. Based on the headings in part II of the statutes, [Patentee] draws a distinction between the heading under which § 101 appears, 'inventions patentable,' and 'conditions of patentability' under which §§ 102 and 103 are listed.

793 F.3d 1306, 1329–30 (Fed. Cir. 2015). Ultimately, the Federal Circuit held that jurisdiction over the alleged infringer's § 101 eligibility challenge was proper for the following reasons:

> [Patentee] is correct that a strict adherence to the section titles can support an argument that § 101 is not listed as a 'condition of patentability,' but rather has the heading of 'inventions patentable.' However, as noted by the [United States Patent and Trademark Office ("USPTO")], both our opinions and the Supreme Court's opinions over the years have established that § 101 challenges constitute validity and patentability challenges. *See also Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 453 (Fed. Cir. 1985); *Aristocrat*, 543 F.3d at 661 n.3.
>
> It would require a hyper-technical adherence to form rather than an understanding of substance to arrive at a conclusion that § 101 is not a ground available to test patents under either the [Post Grant Review] or § 18 processes. Section 101 validity challenges today are a major industry, and they appear in case after case in our court and in Supreme Court cases, not to mention now in final written decisions in reviews under the [America Invents Act ("AIA")]. The numerous cases in our court and in the Supreme Court need no citation . . . .
>
> It is often said, whether accurate or not, that Congress is presumed to know the background against which it is legislating. Excluding § 101 considerations from the ameliorative processes in the AIA would be a substantial change in the law as it is understood, and requires something more than some inconsistent section headings in a statute's codification. We agree with the USPTO and SAP and we so hold that, looking at the entirety of the statutory framework and considering the basic purpose of CBM reviews, the [Patent Trial and Appeal Board ("PTAB")] acted within the scope of its authority delineated by Congress in permitting a § 101 challenge under AIA § 18.

*Id.* at 1330. Of course, as RPost emphasizes, the *Versata* court decided a slightly different issue, i.e., the jurisdiction of a court to rule on a § 101 challenge brought under AIA § 18. *See id.* To that end, RPost contends that the statutory history of the AIA is different than that of the Patent Act, and thus argues that Congress did not specify § 101 as a "condition of patentability" for purposes of § 282 in *infringement* litigation. *See* (Doc. 299 at 8–13).

- 8 -

Appx8

Similar to the Federal Circuit in *Versata*, the Court finds that a "hyper-technical adherence" to the section heading of § 101 is not enough to overcome decades of interpreting § 101 as a valid defense in patent infringement litigation. *See Lewis v. Hegstrom*, 767 F.2d 1371, 1376 (9th Cir. 1985) (noting that courts must not hinge "interpretation of a statute upon a single word or phrase but rather look to the statute as a whole, as well as its object and policies"); *see also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) ("The title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase." (quotation omitted)). This is not a case where a mere sprinkling of district courts has incorrectly interpreted an infrequently-invoked statute or where a sharp divide exists in the judicial system. Indeed, the Supreme Court and Federal Circuit unwaveringly consider § 101 to be a viable and robust defense in the context of patent infringement litigation.[4] Whether couched as a "threshold test," *see Bilski*, 561 U.S. at 602, or a "condition of patentability," *see Aristocrat*, 543 F.3d at 661 n.3, it is firmly decided that the Court has jurisdiction to determine whether the Asserted Patents claim eligible subject matter under § 101, and RPost's reliance on § 101's section heading is not enough to create a "substantial change in the law as it is understood," *Versata*, 793 F.3d at 1330.

### c.    Conclusion

For the foregoing reasons, the Court concludes that it has jurisdiction to consider whether the Asserted Patents claim patent-eligible subject matter as required by § 101. Accordingly, the Court now turns to the merits of GoDaddy's § 101 argument.

### 2.    Legal Standard for § 101 Eligibility

As quoted above, § 101 of the Patent Act defines the subject matter eligible for

---

[4] In fact, during the pendency of these motions, the Federal Circuit has decided multiple cases where a party accused of patent infringement has invoked § 101 as a defense. *See, e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, – F.3d –, 2016 WL 2865693, at *3 (Fed. Cir. May 17, 2016); *Enfish, LLC v. Microsoft Corp.*, – F.3d –, 2016 WL 2756255, at *4 (Fed. Cir. May 12, 2016).

- 9 -

1  patent protection as follows: "Whoever invents or discovers any new and useful process,

2  machine, manufacture, or composition of matter, or any new and useful improvement

3  thereof, may obtain a patent therefor, subject to the conditions and requirements of this

4  title." § 101. "Issues of patent-eligible subject matter are questions of law" reserved

5  exclusively to the Court. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366,

6  1369 (Fed. Cir. 2011).

7      The Supreme Court, as noted above, has identified a two-part test for § 101 patent-

8  eligibility in infringement litigation. *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct.

9  at 1296–97). First, the Court must determine whether the claims at issue are directed to a

10  patent-ineligible concept, i.e., "Laws of nature, natural phenomena, and abstract ideas."

11  *Id.* (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107,

12  2116 (2013)). The term "abstract idea" embodies "the longstanding rule that an idea of

13  itself is not patentable." *Id.* (citing *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). Not

14  surprisingly, "precision has been elusive in defining an all-purpose boundary between the

15  abstract and the concrete." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343,

16  1345 (Fed. Cir. 2015); *see Versata*, 793 F.3d at 1331 (noting that the abstract ideas

17  exception "is more of a problem, a problem inherent in the search for a definition of an

18  'abstract idea' that is not itself abstract").[5]

19      Nonetheless, several guiding principles emerge from Supreme Court and Federal

20  Circuit precedent. For example, if the heart of the patent is a "fundamental economic

21  practice," "conventional business practices," or a "method of organizing human activity"

22  that has long been "prevalent in our system of commerce," then the patent is directed to

23  an abstract idea. *Alice*, 134 S. Ct. at 2356; *see DDR Holdings LLC v. Hotels.com, L.P.*,

24  773 F.3d 1245, 1256 (Fed. Cir. 2014) (same). Moreover, concepts involving processes

25  humans can perform without the aid of a computer, such as processes that can be done

26  _____

27      [5] The Federal Circuit has strained for years to develop a coherent and consistent
    test for ascertaining what is or is not an "abstract idea." *See MySpace*, 672 F.3d at 1259
28  ("This effort to descriptively cabin § 101 jurisprudence is reminiscent of the oenologists
    trying to describe a new wine.").

1   mentally or using pen and paper, are generally directed to abstract ideas. *See, e.g.*,

2   *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347

3   (Fed. Cir. 2014) (noting that "humans have always performed" the functions of

4   collecting, recognizing, and storing data); *CyberSource*, 654 F.3d at 1373 ("[A] method

5   that can be performed by human thought alone is merely an abstract idea and is not

6   patent-eligible under § 101."); *Gottschalk*, 409 U.S. at 67 (observing that the conversion

7   of binary numerals can be done mentally using a mathematical table). Notably, method

8   patents, like the ones at issue in this case, present "special problems in terms of

9   vagueness and suspect validity." *Bilski*, 561 U.S. at 608.

10        If the claims at issue are directed to a patent-ineligible concept, the Court must

11   then consider "what else" encompasses the claims to determine whether an "inventive

12   concept," i.e., "an element or combination of elements that is 'sufficient to ensure that the

13   patent in practice amounts to significantly more than a patent upon the [ineligible

14   concept] itself,'" exists. *Alice*, 134 S. Ct. at 2360 (quoting *Mayo*, 132 S. Ct. at 1298). The

15   Supreme Court has recognized that "[a]t some level, all inventions embody, use, reflect,

16   rest upon, or apply laws of nature, natural phenomenon, or abstract ideas." *Id.* at 2354

17   (citing *Diamond*, 450 U.S. at 187). Thus, only if an invention applies a patent-ineligible

18   concept towards a "new and useful end" will it remain eligible for patent protection. *Id.*

19   (citing *Gottschalk*, 409 U.S. at 67). To perform this analysis, the Court reviews "the

20   elements of each claim both individually and as an ordered combination to determine

21   whether the additional elements transform the nature of the claim into a patent-eligible

22   application." *Id.* (internal quotations omitted). Ultimately, the Court must "distinguish

23   between patents that claim the building blocks of human ingenuity and those that

24   integrate the building blocks into something more, thereby transforming them into a

25   patent-eligible invention." *Id.* (citing *Mayo*, 132 S. Ct. at 1303).

26        Notably, "[m]erely requiring a generic computer implementation fails to transform

27   [an] abstract idea into a patent-eligible invention." *Id.* at 2352; *see, e.g.*, *buySAFE, Inc. v.*

28   *Google, Inc.*, 765 F.3d 1350, 1354–55 (Fed. Cir. 2014) (noting that *Alice* "made clear that

- 11 -

1    a claim directed to an abstract idea does not move into § 101 eligibility territory by

2    merely requiring generic computer implementation" (quotation omitted)); *Ultramercial,*

3    *Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("[A]dding a computer to

4    otherwise conventional steps does not make an invention patent-eligible."). If the claim

5    purports to solve a problem arising only in the Internet context, the claim must be

6    innovative enough to "override[] the routine and conventional" use of the computer. *DDR*

7    *Holdings*, 773 F.3d at 1258–59.

8                   **3.**     **Burden of Proof**

9       By statute, issued patents are "presumed valid." § 282(a). As the party challenging

10    the validity of the Asserted Patents, GoDaddy bears the burden of proof. *See Microsoft*

11    *Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). RPost argues that GoDaddy must

12    meet this burden by setting forth "clear and convincing evidence" of patent ineligibility.

13    (Doc. 299 at 14). GoDaddy, however, contends that "the usual presumption of validity

14    does not apply" to issues of patent-eligibility. (Doc. 257 at 8).

15       While district courts have varied in their approaches when ruling on a validity

16    challenge based on patent-eligibility, *see, e.g.*, *Broadband iTV, Inc. v. Oceanic Time*

17    *Warner Cable, LLC*, 135 F. Supp. 3d 1175, 1180 (D. Haw. 2015) (declining to apply the

18    presumption of validity but requiring clear and convincing evidence to prove underlying

19    questions of fact); *Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 2015 WL 4203469, at *5 (D. Or.

20    July 9, 2015) ("[T]he Court fails to see how the 'clear and convincing' standard applies to

21    the validity analysis under Section 101 in this case."), and at least one Federal Circuit

22    judge believes that "applying a presumption of eligibility is particularly unwarranted,"

23    *Ultramercial*, 772 F.3d at 720 (Mayer, J., concurring), neither the Supreme Court nor the

24    Federal Circuit has issued a controlling decision designating which standard applies.

25    Nonetheless, the Court finds it unnecessary to resolve this issue because even if the clear

26    and convincing standard applied and the Asserted Patents were presumed eligible, the

27    result of this case would be no different than if the preponderance of the evidence

28    standard applied without a presumption of validity.

### 4.    Feldbau Patent[6]

The Feldbau Claims disclose a "method of authenticating" that a sender of a "dispatch" "electrically transmitted" it to a particular destination at a particular time and that it had a particular content. '219 Patent, col. 2 ll. 56–col. 3 ll. 14 (amended version).[7] The Feldbau Claims accomplish this objective by having the sender of the transmission "electrically transmit" the contents to a non-interested third party, i.e., "an authenticator." *Id.* at col. 2 ll. 63–67. The authenticator then "associates" information such as the time of the successful transmission and the dispatch's contents to "generate" data that "authenticate[s] the dispatch and the contents of the dispatch," i.e., "authentication data." *Id.* at col. 3 ll. 1–7. The authenticator must also "secure" the authentication data "against tampering." *Id.* at col. 3 ll. 8–10. In full, the Feldbau Claims recite as follows:

> **60**. A method of authenticating a dispatch and contents of the dispatch successfully transmitted from a sender to a recipient, comprising the steps of:
>
> receiving content data representative of the contents of the dispatch originated from the sender and being electrically transmitted to said recipient, and a destination of the dispatch;
>
> providing an indicia **[relating to]** *of* a time of *successful* transmission of the dispatch *to the recipient*, said time related indicia being *recorded by an authenticator and* provided in a manner resistant to or indicative of tampering by either of the sender and the recipient;
>
> associating, by **[an]** *the* authenticator functioning as a noninterested third party with respect to the sender and the recipient, the content data with dispatch record data which includes at least said time related indicia and an indicia related to the destination of the dispatch, to generate authentication data which authenticate the dispatch and the contents of the dispatch; and
>
> securing by said authenticator at least part of the authentication data against tampering of the sender and the recipient;

---

[6] The asserted claims of the Feldbau Patent are Claim Nos. 60, 62, 66, and 69. *See* (Docs. 258 at 12; 271-5 at 2; 300 at 10). These claims will be referenced herein as the "Feldbau Claims."

[7] In 2012, the Feldbau Patent underwent an Ex Parte Reexamination by the USPTO. *See* (Doc. 271-16 at 25). Several claims—including two of the claims asserted against GoDaddy in this case—were amended upon Reexamination. *See* (*id.* at 26). When citing to the reexamined patent, the Court will refer to it as the "amended version."

- 13 -

> wherein at least one of the steps of associating and securing utilizes mathematical association methods for a selected portion of a combination of the content data and the dispatched record data.

*Id.* at col. 2 ll. 56–col. 3 ll. 14 (amendments by Ex Parte Reexamination Certificate are shown in italics; deletions in bolded square brackets).

> **62**. A method according to claim **60**, further including the step of providing an output of at least part of the authentication data.

'219 Patent, col. 24 ll. 32–34.

> **66**. A method according to claim **60**, wherein the step of providing the time **[related]** indicia includes generating the time **[related]** indicia.

'219 Patent, col. 3 ll. 17–19 (amended version) (amendments by Ex Parte Reexamination Certificate are shown in italics; deletions in bolded square brackets).

> **69**. A method according to claim **60**, wherein the authentication data further includes a delivery indicia relating to said dispatch.

'219 Patent, col. 24 ll. 52–54.

To begin, the Court must determine whether the Feldbau Claims are drawn to a patent-ineligible concept, i.e., law of nature, natural phenomena, or abstract idea. *See Alice*, 134 S. Ct. at 2355. If so, the Court will then consider whether the claims add an "inventive concept" such that the ineligible concept transforms into a patent-eligible application. *Id.*

### a.    Step One: Patent-Ineligible Concept

GoDaddy argues that the Feldbau Claims are directed to the abstract idea of collecting and providing information about a dispatch and its contents using a third party intermediary. (Doc. 257 at 18). GoDaddy contends that the asserted claims simply apply "pure math" to accomplish its goals. (*Id.*) In response, RPost insists that the Feldbau Claims "address[] the specific technical problem of proving that specific information has been electronically sent at a specific time to a specific receiving party" by having an "authenticator [] generate authentication data which authenticate[s] the dispatch and the contents of the dispatch." (Doc. 299 at 20). RPost explains that the Feldbau Claims do not use "pure math" but apply "specific functions" performed by the authenticator. (*Id.*)

- 14 -

Although RPost's application of the Feldbau Claims may be phrased in its narrow, flowery rhetoric, the claim language is not nearly as particularized. Rather, the Feldbau Claims are directed to a general method of collecting and providing information about a dispatch using a third party intermediary. This is an abstract idea that has an extensive history dating back decades, if not centuries. For example, the Fedlbau Patent's specification posits that "[p]ost, courier, forwarding and other mail services, which enable people to exchange documents and data, have been widely used both in the past and at the present time." '219 Patent, col. 1 ll. 23–29. The specification further describes how third party intermediaries collect and provide certain information about a message in the modern world,

> Proof of delivery of non-electronic documents is provided, for example, by Registered Mail and courier services. It is commonly used to authenticate the delivery of materials at a certain time to a certain party, and serves as admissible proof of delivery in a court of law. However, no proof is provided as to the information contents of the specific dispatch.
> E-mail and other electronic messages forwarding services are commonly used today. The sender sends a message to the dispatching service which, in turn, forwards the message to the destination and provides the sender with a delivery report which typically includes the date and time of the dispatch, the recipient's address, the transmission completion status, and sometimes even the transmitted data, the number of pages delivered, the recipient's identification information, and so on. The provided delivery report mainly serves for accounting purposes and for notifying the sender of the dispatch and/or its contents. . . .

*Id.* at col. 2 ll. 26–44. Thus, the specification's own language details how the general concept at the heart of the Feldbau Claims is one that has been implemented for years.

Moreover, despite the possibility for a narrow application, the Court finds that the claimed idea is comparable to claims that the Supreme Court and Federal Circuit have determined to be drawn to abstract ideas. *See, e.g.*, *Gottschalk*, 409 U.S. at 71 (holding abstract and ineligible patent claims involving an algorithm for converting binary-coded decimal numerals into pure binary form); *Parker v. Flook*, 437 U.S. 584, 594–95 (1978) (holding abstract and ineligible a mathematical formula for computing "alarm limits" in a catalytic conversion process); *Alice*, 134 S. Ct. at 2360 (holding abstract and ineligible a

- 15 -

1    generalized computer method of intermediated settlement whereby two parties using a

2    third-party intermediary exchange financial obligations); *Bilski*, 561 U.S. at 609 (finding

3    that the concept of "hedging or protecting against risk" was drawn to an abstract idea);

4    *buySAFE*, 765 F.3d at 1353, 1355 (finding that "transaction performance guaranty" was

5    an abstract idea because the "narrowing of such long-familiar commercial transactions [to

6    particular relationships] does not make the idea non-abstract for section 101 purposes");

7    *Digitech Image Techs. LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348–51 (Fed.

8    Cir. 2014) (holding that claims directed to digital image processing using math to

9    combine data into a device profile were too abstract despite narrow application);

10   *Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1367 (Fed. Cir. 2015)

11   (holding that a method patent aimed at "tracking" and "storing" information was directed

12   to patent-ineligible abstract idea of budgeting); *Bancorp Servs., L.L.C. v. Sun Life Assur.*

13   *Co. of Canada (U.S)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (holding that a method patent

14   to track, reconcile, and administer life insurance policies was not drawn to patent eligible

15   subject matter); *In re TLI Commc'ns*, 2016 WL 2865693, at *3 (concluding that claims

16   directed to "classifying and storing digital images in an organized manner" were abstract

17   and ineligible); *Content Extraction*, 776 F.3d.at 1347 (finding that claims directed to

18   collecting, recognizing, and storing data were abstract and ineligible); *Cyberfone Sys.,*

19   *LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x. 988, 991–92 (Fed. Cir. 2014)

20   (concluding that concept of "using categories to organize, store, and transmit

21   information" is an abstract idea).

22       Moreover, the Feldbau Claims are not directed to a specific improvement in

23   computer functionality but simply recite conventional and generic technology to perform

24   "generalized steps" in a well-known computer environment. *Enfish*, 2016 WL 2756255,

25   at *4–5; *see In re TLI Commc'ns*, 2016 WL 2865693, at *3 (same). RPost's argument

26   that the Feldbau Claims do not solely rely on "pure math" to "associat[e]" information is

27   belied by a cursory review of the claim language. Particularly, the claims designate only

28   one possible "association" or "securing" method: "mathematical association." '219

Patent, col. 3 ll. 11–14 (amended version). Beyond "mathematical association," the claims do not recite any other method for how the undefined "authenticator" is to associate or secure the data or detail what "mathematical association" method is to be applied. Even if the claim language did so, the claims would still be drawn to an abstract idea. *See Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations, such as consulting an activity log, add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea[.] ").

Furthermore, the method outlined in the Feldbau Claims is directed to a patent-ineligible "mental" process. The claimed "associating" and "securing" functions, "while 'primarily useful for computerized [applications],' could still be made [using a] pencil and paper." *Parker*, 437 U.S. at 586 (citations omitted). In fact, the Feldbau Claims are not even limited to an electronic embodiment. The only language plausibly requiring electronic implementation is "receiving content data representative of the contents of the dispatch originated from the sender and being electrically transmitted to said recipient, and a destination of the dispatch." '219 Patent, col. 2 ll. 59–62. However, whether the "sender" or "recipient"[8] "electrically transmit" a dispatch has no bearing on whether the *authenticator's* claimed functionality is restricted to an electronic embodiment.[9] To be sure, the specification teaches that the claimed authenticator-implemented functions of "associating" and "securing" can be performed *manually*. Particularly, Figure 1 illustrates as follows:

_____

[8] The Court construed "sender" and "recipient" as requiring "computerized devices." (Doc. 219 at 101–03). Nonetheless, whether the "sender" and "recipient" require computerized devices has no bearing on the functionality of the *authenticator*, which is a separate and distinct third-party intermediary.

[9] At *Markman*, the parties stipulated that "authenticator" be construed as "a sub-system that operates to authenticate a dispatch." (Doc. 219 at 26). This construction does not necessarily limit the authenticator to an electronic embodiment.



**Fig. 1**

'219 Patent, Fig. 1. The specification defines Figure 1 as a "schematic pictorial illustration of the authentication method of the present invention implemented in a manual manner," *id.* at col. 4 ll. 45–47, and describes Figure 1 as follows:

> Reference is now made to FIG. **1** which illustrates the method of the present invention as it can be implemented for paper documents being sent non-electronically. The method of FIG. **1** can be implemented for documents sent via any document dispatching service, such as a courier service or the registered mail service of the post office.
>
> The sender **10** provides the documents **12** to be sent and a destination address **14** to a clerk **20** of the document dispatching service. The clerk **20** prepares a dispatch sheet **26**, which typically has a unique dispatch identifier (not shown) and has room for dispatch information such as the date and time of dispatch or delivery **16**, the destination address **14**, an indication **18** of proof of delivery such as the recipient's identity and/or signature, and optionally, additional dispatch information such as the dispatcher's signature and the identity of the sender.
>
> The clerk **20** fills in the dispatch sheet **26** with the date/time **16** and the address **14**, and then prepares a copy **24** of the documents **12** and a copy **34** of the dispatch sheet **26**, typically by utilizing a copy machine **22** or an electronic scanner. The clerk **20** then places the original documents **12** into an envelope **28** carrying the address **14**, and sends the envelope **28** to its destination **30**. In one embodiment of the present invention the dispatching service utilizes a cash-register like device to fill in the dispatch sheet **26**.

- 18 -

This provides for reliable time stamping and automated dispatch record keeping. *Furthermore, the electronic dispatch information produced by such device can be associated using a special mathematical method as discussed in greater detail below.*

*The clerk **20** associates the copy **24** of the documents **12** with the copy **34** of the dispatch sheet **26** by any method*, a few examples of which follow:

a) by inserting the documents copy **24** and the dispatch sheet copy 34 into an envelope **32**;

b) by inserting the copy **24** of the documents into an envelope **32** and marking the dispatch identifier on the outside of the envelope **32**;

c) by printing the dispatch identifier on the documents copy **24**; or

d) attaching the copies **24** and **34** and applying the stamp of the dispatch service in such a manner that part of the stamp is on the copy **24** of the documents and part of the stamp is on the copy **34** of the dispatch sheet **26**.

Preferably, the clerk **20** secures the copies **24** and **34** in a manner that makes it difficult to modify or replace the information contained therein, for example by marking the pages of the copy **24** with the dispatching service's signature, stamp or seal, by spreading each page with invisible or other ink, by sealing the envelope **32** or by retaining them in the service's secure file **36** and so forth.

*Id.* at col. 4 ll. 66–col. 5 ll. 50 (emphasis added); *see also id.* at col. 5 ll. 51–col. 6 ll. 30. Based on this language, it is indisputable that the Feldbau Claims are directed to a concept that can be performed manually.[10] Regardless, even if an electronic limitation for the claimed method existed, it would do little to limit the Feldbau Claims' expansive scope. The specification makes clear that the Feldbau Claims are not restrained to a particular application as they encompass "all types" of information, "all types" of dispatch methods, and "all types" of methods and devices for "associating" and "securing" the authentication data. *Id.* at col. 4 ll. 1–7 ll. 16–19. This lack of specificity underscores the abstract nature of the claims. *See Internet Patents*, 790 F.3d at 1348–49

---

[10] During oral argument, RPost attempted to distinguish Figure 1 as not being a pictorial representation of the "authenticator" because the specification does not expressly define it as such. This argument is unpersuasive. The specification unambiguously defines Figure 1 as an illustration of "the authentication method of the present invention." *Id.* at col. 4 ll. 45–47. There can be no dispute that the Feldbau Claims embody the "authentication method of the present invention."

- 19 -

(finding that claims were directed to abstract idea of maintaining computer state without recitation of specific activity used to generate that result).

Finally, RPost's argument that the Feldbau Claims "do not preempt all ways of accomplishing the alleged abstract idea," (Doc. 299 at 21), is not dispositive. The Federal Circuit confirmed that the simple fact that "the claims do not preempt all [methods of providing information about a dispatch] or may be limited to [such activity in the electronic] setting do not make them any less abstract." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015) (citing *buySAFE*, 765 F.3d at 1355).

For these reasons, the Court concludes that the Feldbau Claims, describing a method of collecting and providing information about a dispatch and its contents using a third-party intermediary, falls squarely within the "collection and organization of data" characterization deemed by the Federal Circuit to be abstract. *CyberSource*, 654 F.3d at 1370; *see, e.g.*, *YYZ, LLC v. Hewlett-Packard Co.*, 2015 WL 5886176, at *3 (D. Del. Oct. 8, 2015) ("Because computer software comprises a set of instructions, the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas."). Thus, the Feldbau Claims are directed to an abstract idea.

**b.    Step Two: Inventive Concept**

Because the Feldbau Claims are drawn to a patent-ineligible concept, the Court must next consider whether the claims add an "inventive concept" that transforms the claims into a patent-eligible application. *See Alice*, 134 S. Ct. at 2355. The Court finds that beyond the abstract idea of collecting and providing information about a particular dispatch, the claims merely recite "well-understood, routine conventional activities," such as mathematical association or routine data-gathering and storing steps. *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294). Considered individually or taken together as an ordered combination, the claim elements fail to "'transform' the claimed abstract idea into a patent-eligible application." *Id*. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).

RPost insists that the Feldbau Claims disclose at least two inventive concepts: the "authenticator"-implemented steps of (1) associating content data with dispatch record

- 20 -

data to generate authentication data and (2) securing the authentication data. (Doc. 299 at 21–22). But beyond requiring that "at least one of the steps of associating and securing" be performed by an undefined "mathematical association method," the Feldbau Claims do not specify what type of mathematical association is performed or explain how the content data is associated with the dispatch record data in a manner that generates authentication data. *See* '219 Patent, col. 3 ll. 11–14 (amended version). Similarly, the unremarkable claim that the authentication data "authenticate[s] the dispatch and the contents of the dispatch," *id.* at col. 3 ll. 6–7, fails to explain what material comprises authentication data.

Furthermore, the Feldbau Claims do not detail what the "authenticator" actually is or how the device secures the data against tampering beyond requiring "at least one of" the associating or securing steps be performed by an amorphous "mathematical association method." *Id.* at col. 3 ll. 11–14. Instead, the "authenticator" is loosely defined as "all types of apparatus" capable of performing the associating and securing functions, *see* '219 Patent, col. 4 ll. 16–19, and therefore is not tied to "a particular machine or apparatus," *Bilski*, 561 U.S. at 601. In other words, the Feldbau Claims broadly indicate what the "authenticator" *does*, but not what it *is*; this does not add "significantly more" to the abstract idea. *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294).

Ultimately, the Court finds that the "associating" and "securing" "computer functions are 'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *OIP Techs.*, 788 F.3d at 1363 (holding that "sending a first set of electronic messages over a network to devices, the devices being programmed to communicate, storing test results in a machine-readable medium, and using a computerized system . . . to automatically determine an estimated outcome and setting a price" were conventional activities); *CyberSource*, 654 F.3d at 1373 ("[C]omputational methods which can be performed entirely in the human mind are

- 21 -

the types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none." (quoting *Gottschalk*, 409 U.S. at 67)). The Feldbau Claims merely "add" the generic computer functions of "associating" and "securing" to the claimed abstract idea of collecting and providing information about a particular dispatch. As explained above, these steps could be performed by humans without a computer as the only connection to an electrical embodiment concerns the sending of the message, not the functions of the authenticator. *See Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) ("The series of steps covered by the asserted claims—borrower applies for a loan, a third party calculates the borrower's credit grading, lenders provide loan pricing information to the third party based on the borrower's credit grading, and only thereafter (at the election of the borrower) the borrower discloses its identity to a lender—could all be performed by humans without a computer."). This is not enough to constitute an inventive concept under *Alice*. *See DDR Holdings*, 773 F.3d at 1256 ("[A]fter *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible. The bare fact that a computer exists in the physical rather than purely conceptual realm is beside the point." (internal citations and quotation marks omitted)); *Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible.").[11]

Finally, nothing in the Feldbau Claims "purport[s] to improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, "effect an improvement in any other technology or technical field," *id.*; *see Enfish*, 2016 WL 2756255, at *4, or solve a problem unique to the Internet, *see DDR Holdings LLC*, 773 F.3d at 1257. The Feldbau Claims' method of converting input information (i.e., dispatch time, content, and destination data) to output information (i.e., authentication data) does not add

---

[11]   In fact, the encryption and association methods described in the Feldbau Patent's specification are described as "widely used for security and for authentication purposes." '219 Patent, col. 2 ll. 9–18.

- 22 -

significantly more to the claimed abstract idea, *see Alice*, 134 S. Ct. at 2358, nor is it innovative enough to "override the routine and conventional" use of the computer, *see DDR Holdings*, 773 F.3d at 1258–59; *Enfish*, 2016 WL 2756255, at \*7–8.

In sum, the Feldbau Claims are directed to the abstract idea of collecting and providing information about a particular dispatch and its contents using an unspecified "authenticator" that applies an undefined "mathematical association method" to "associate" and "secure" pre-existing information. These generic conventional activities—even if carried out by a computer—are not sufficient to pass the second step of *Alice*. *See, e.g.*, *Intellectual Ventures I*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." (quoting *Alice*, 134 S. Ct. at 2359–60)); *Digitech*, 758 F.3d at 1349–51 (holding ineligible a concept of gathering and combining data by reciting steps of organizing information through mathematical relationships where the gathering and combining merely employed mathematical relationships to manipulate existing information to generate additional information in the form of a "device profile" without limit to any use of the device profile).

### c. Conclusion

For the foregoing reasons, the Court concludes that the Feldbau Claims are drawn to the abstract idea of collecting and providing information about a particular dispatch and fail to add "significantly more" such that an "inventive concept" "transforms" that idea into a patent-eligible application. *See Alice*, 134 S. Ct. at 2355. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that Feldbau Patent Claim Nos. 60, 62, 66, and 69 are invalid under § 101.

### 5. Tomkow Patents

GoDaddy also contends that the Tomkow Patents claim patent-ineligible subject matter without adding inventive concepts to confer validity. (Doc. 257 at 10–14). In GoDaddy's view, the Tomkow Patents are all directed to the same abstract idea: "collecting and providing information for verifying transmission and/or delivery of a

- 23 -

Appx23

1    message." (*Id.* at 14). GoDaddy argues that no inventive concept is added because the

2    claims merely address conventional activities without solving a problem unique to the

3    Internet. (*Id.* at 14–15).

4    RPost responds that the Tomkow Patents do not simply recite the collection and

5    provision of generic information about a message but provide "specific" steps to verify

6    the receipt of a message using "specific information." (Doc. 299 at 14). To that end,

7    RPost argues that the Tomkow Patents provide a technical solution to a technical

8    problem. (*Id.* at 17). RPost explains that "[t]he technical problem addressed by the

9    Tomkow patents is providing reliable proof of content and delivery of electronic

10   messages without requiring the co-operation of the recipient and without requiring

11   special e-mail software," while the technical solution entails "using an intermediate

12   server between a sender and receiver of an electronic message" to provide a "first

13   information" or "authenticatible information." (*Id.* at 17–18). Thus, RPost insists that the

14   inventive concept "does not lie in the computer hardware" or software but "in the

15   technical features recited by the asserted claims." (*Id.* at 19).

16   As noted above, the Tomkow Patents are the '913, '104, '198, '199, and '389

17   Patents. These patents share a specification and are broadly described as "a system and

18   method for verifying delivery and integrity of electronic messages." *See* '913 Patent,

19   (54). Nonetheless, each Tomkow Patent describes a slightly different method to provide

20   slightly different information, and thus, the Court will address each patent separately.

21                    **a.    '913 Patent**[12]

22   The '913 Patent Claims disclose "a system and method for verifying delivery and

23   integrity of electronic messages" sent by a sender to a recipient through a server. *Id.* The

24   '913 Patent Claims accomplish this goal by having the server record "some portion" of a

25   mail transport protocol dialog, either Simple Mail Transport Protocol ("SMTP") or

26   Extended Mail Transport Protocol ("EMTP"), in which a Mail Transport Agent ("MTA")

27   _____

28   [12] The asserted '913 Patent claims are Claim Nos. 1 and 2. *See* (Docs. 258 at 2;
     271-5 at 2; 300 at 2). These claims will be referenced as the "'913 Patent Claims."

- 24 -

for the recipient accepts or declines delivery of the message. *Id.* at col. 27 ll. 48–54. In full, the '913 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient through a server acting as a Mail Transport Agent, including the steps at the server of:
> transmitting the message to the recipient's Mail Transport Agent in a protocol dialog selected from a group consisting of the selected one of the SMTP and ESMTP protocols; and
> recording at the server some portion of the selected one of the SMTP and ESMTP protocol dialog between the server and the recipient through the server including those portions of the selected one of the SMTP and ESMTP protocol dialog between the server and the recipient in which the receiving Mail Transport Agent accepts or declines delivery of the transmitted message

> **2**. The method as set forth in claim 1, including the step of:
> storing the recorded dialog in some form in which it may be associated with the message and the sender and the recipient of the message in such a way that it may be used to document the delivery history of the message from the sender to the recipient.

*Id.* at col. 27 ll. 41–60.

### i.    Step One: Patent-Ineligible Concept

The Court finds that the '913 Patent Claims are directed to the abstract idea of collecting information about the delivery of a message. Similar to the Feldbau Claims, the concept of collecting delivery information about a message has been practiced in various forms for decades, if not centuries. Most notably, the method disclosed by the '913 Patent Claims is essentially an electronic version of certified or registered mail that has long been implemented by the United States Postal Service ("USPS"). *See* '913 Patent, col. 1 ll. 33–37; (Docs. 258 at 5–8; 294 at 26).[13] In fact, the '913 Patent's

---

[13] To the extent RPost "objects" to GoDaddy's provision of historical references concerning USPS under Local Rule of Civil Procedure for the District Court of Arizona 7.2(m)(2), *see* (Doc. 299 at 22–23), the Court overrules the objection. Not only do the Tomkow Patents disclose that the patented subject matter attempts to mirror the services provided by USPS, *see, e.g.*, '219 Patent, col. 2 ll. 26–33; '913 Patent, col. 1 ll. 28–42, GoDaddy analyzed the USPS relationship during *Markman* briefing, *see, e.g.*, (Doc. 117 at 12), and disclosed the USPS connection in its invalidity contentions, *see* (Doc. 304-1 at

- 25 -

1   specification details how USPS and private mail carriers such as the United Parcel

2   Service ("UPS") and Federal Express ("FedEx") provide "confirmation that [a] letter was

3   successfully delivered to the addressee or the addressee's authorized agent." '913 Patent,

4   col. 1 ll. 33–42. The shared-specification goes on to teach that the goal of the Tomkow

5   Patents is to reach if not surpass the evidentiary heights of USPS-registered mail. *See id.*

6   at col. 3 ll. 11–14. In other words, the heart of the '913 Patent Claims is directed to a

7   "conventional business practice" that has long been "prevalent in our system of

8   commerce." *Alice*, 134 S. Ct. at 2356.

9          Much of what RPost believes is pertinent under the first step of *Alice* is more

10  applicable to the second step of the inquiry. For example, whether the '913 Patent Claims

11  disclose "specific" or "defined" steps, *see* (Doc. 299 at 14), speaks to whether the claims

12  add "something more" to transform the claimed concept into a patent-eligible application,

13  not whether the concept itself is abstract. *See Ultramercial*, 772 F.3d at 715 ("We do not

14  agree . . . that the addition of merely novel or non-routine components to the claimed idea

15  necessarily turns an abstraction into, something concrete. In any event, any novelty in

16  implementation of the idea is a factor to be considered only in the second step of the

17  *Alice* analysis."). Being abstract does not mean that a concept is devoid of steps. Multi-

18  step, computer-implemented method patents are frequently found ineligible as directed to

19  abstract ideas. *See, e.g.*, *Digitech*, 758 F.3d at 1349–51; *Mortg. Grader*, 811 F.3d at 1324;

20  *Internet Patents*, 790 F.3d at 1348–49. Here, although the '913 Patent Claims include

21  "specific" steps, the steps are "generalized steps to be performed on a computer using

22  conventional computer activity." *Enfish*, 2016 WL 2756255, at *7. The "heart" of a

23  patent is determinative for *Alice* step one, *see Ultramercial*, 772 F.3d at 714, and as

24  expressed above, the heart of the '913 Patent Claims is drawn to the abstract idea of

25  collecting information about the delivery of a message.

26         RPost also argues that the numerous prior art references disclosed in the

27  specification demonstrate that there is "no risk of preempting . . . the entire field of

28  ────────────────────────────────────

4). The Court finds these disclosures are adequate.

- 26 -

1    creating a delivery receipt using tracking information." (Doc. 299 at 15–16). The Federal

2    Circuit has soundly rejected this argument. In *Vehicle Intelligence & Safety LLC v.*

3    *Mercedes-Benz USA, LLC*, the appellant argued that "the existence of prior art methods

4    of equipment operator testing, evidenced by the eleven prior art references identified in

5    the . . . specification, prove that the claims at issue do not preempt the abstract idea of

6    performing equipment operator testing because these references describe non-infringing

7    methods for doing so." 2015 WL 9461707, at *3 (Fed. Cir. Dec. 28, 2015). The Federal

8    Circuit jettisoned this contention as "meritless" because "the mere existence of a non-

9    preempted use of an abstract idea does not prove that a claim is drawn to patent-eligible

10   subject matter." *Id.* The Federal Circuit explained that if it adopted such an approach,

11   then "all a patentee would need do to insulate itself from a § 101 challenge would be to

12   identify a single prior art reference in the specification and state that its invention

13   improves upon that reference." *Id.*; *see also OIP Techs.*, 788 F.3d at 1362–63.

14          Furthermore, the tangible, physical components recited by the '913 Patent Claims

15   "merely provide a generic environment in which to carry out the abstract idea" of

16   collecting information about the delivery of a message. *In re TLI Commc'ns*, 2016 WL

17   2865693, at *3; *see ART+COM Innovationpool GmbH v. Google Inc.*, 2016 WL

18   1718221, at *4 (D. Del. Apr. 28, 2016) (finding that claim was drawn to "abstract idea of

19   storing image data, then repeatedly requesting specific data, which is then stored and

20   displayed"). The specification's emphasis that the present invention "relates generally to

21   a system and method for verifying delivery and content of an electronic message," '913

22   Patent, col. 1 ll. 21–22, without requiring any "special e-mail software," *id.* at col. 2 ll.

23   67–col. 3 ll. 1, underscores that the '913 Patent Claims are directed to an abstract idea.

24          Finally, the Court finds that the concept of collecting information about the

25   delivery of a message is no less abstract than any of the concepts the Supreme Court and

26   Federal Circuit have determined to be drawn to abstract ideas. *See, e.g.*, *CyberSource*,

27   654 F.3d at 1370 ("collection and organization of data"); *Gottschalk*, 409 U.S. at 71

28   (algorithm for converting binary-coded decimal numerals into pure binary form); *Parker*,

- 27 -

Appx27

437 U.S. at 594–95 (formula for computing "alarm limits" in a catalytic conversion process); *Alice*, 134 S. Ct. at 2360 (intermediated settlement whereby two parties using a third-party intermediary exchange financial obligations); *Bilski*, 561 U.S. at 609 ("hedging or protecting against risk"); *buySAFE*, 765 F.3d at 1353, 1355 ("transaction performance guaranty"); *Digitech*, 758 F.3d at 1348–51  (digital image processing using math to combine data into a device profile); *Intellectual Ventures I*, 792 F.3d at 1367 ("tracking" and "storing" information directed to abstract idea of budgeting).

For these reasons, the Court finds that the '913 Patent Claims merely "recite[] generalized steps to be performed on a computer using conventional computer activity," *Enfish*, 2016 WL 2756255, at *7 (citations omitted), and are directed to the abstract idea of collecting information about the delivery of a message.

### ii.  Step Two: Inventive Concept

Because the '913 Patent Claims are drawn to a patent-ineligible concept, the Court must now determine whether there is "significantly more" in the claims that "transforms" that concept into a patent-eligible application. *Alice*, 134 S. Ct. at 2355.

Claim 1 of the '913 Patent recites that a message is "transmitt[ed]" to the recipient's MTA and the server "record[s] some portion of the selected one of the SMTP and ESMTP protocol dialog," '913 Patent, col 27 ll. 48–49, while Claim 2 states that the server "stor[es] the recorded dialog," *id.* at col. 27 ll. 55–56. The '913 Patent Claims therefore invoke three computer-executed functions—"transmitting" information, "recording" information, and "storing" information—all of which can be implemented by "nearly every computer." *See Alice*, 134 S. Ct. at 2361 ("Nearly every computer [is] capable of performing . . . basic calculation, storage, and transmission functions."); *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."). As expressed above, the mere "recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible." *DDR Holdings*, 773 F.3d at 1256; *see Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps does not make an

- 28 -

invention patent-eligible."). Here, the Court finds that the disclosed steps of "transmitting," "recording," and "storing" pre-existing information are "computer functions [that] are 'well-understood, routine, conventional activit[ies]' previously known to the industry." *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see OIP Techs.*, 788 F.3d at 1363 (holding that "sending a first set of electronic messages over a network to devices, the devices being programmed to communicate, storing test results in a machine-readable medium, and using a computerized system . . . to automatically determine an estimated outcome and setting a price" were conventional activities).

RPost suggests "compelling evidence" exists that the '104, '389, and '913 Patents provide a "technical solution to a technical problem" because the PTAB denied petitions to institute CBM patent reviews of the three patents. (Doc. 299 at 18). The threshold standard for instituting a CBM review is whether it is "more likely than not" that a patent is un-patentable. 35 U.S.C. § 324(a). A CBM patent excludes patents for "technological inventions," i.e., patents that claim "a technological feature that is novel and obvious over the prior art; and solves a technical problem using a technical solution." 37 C.F.R. § 42.301(b). Regarding the '913 Patent, the PTAB denied the petitioner's request because the "conclusory language in the petition that none of the steps of a claim requires any novel and unobvious technological implementation, or solves a technical problem, without more, is not sufficient to demonstrate that the claimed subject matter is not a technical invention." (Doc. 304-5 at 10). The PTAB also faulted the petitioner for failing to "analyze[] the method steps separately, instead of examining each claim as a whole, as required" to determine whether the patent is a technological invention. (*Id.*)[14]

The Court has analyzed the '913 Patent Claims as a whole and concludes that no "inventive concept" is recited, nor do the claims purport to solve a technical problem using a technical solution. Instead, the claimed steps are conventional activities that "nearly every computer" can perform. *Alice*, 134 S. Ct. at 2361. To the extent RPost

---

[14] The PTAB applied similar reasoning for the '104 and '389 Patents. *See* (Docs. 304-3 at 9–10; 304-4 at 9–10).

argues that the '913 Patent Claims solve a problem "necessarily rooted in computer technology" as illustrated in *DDR Holdings*, *see* (Doc. 299 at 17), that argument fails for two reasons. First, nothing in the claim language is innovative enough to "override[] the routine and conventional" use of the computer. *Enfish*, 2016 WL 2756255, at *7–8; *DDR Holdings*, 773 F.3d at 1258–59. In fact, the generalized steps of the '913 Patent Claims *are* routine and conventional. Second, the problem purportedly addressed by the '913 Patent Claims is not "necessarily rooted in computer technology" as explained by *DDR Holdings*. The "problem" of verifying the delivery of a message has long troubled mail delivery systems, and the facile fact that the '913 Patent Claims are drawn to electronic mailing is of no consequence. *See, e.g.*, *Alice*, 134 S. Ct. at 2361; *buySAFE*, 765 F.3d at 1355. Ultimately, the claims are "recited too broadly and generically to be considered sufficiently specific and meaningful applications of their underlying abstract ideas." *DDR Holdings*, 773 F.3d at 1256; *see also Internet Patents*, 790 F.3d at 1348 (finding patent ineligible where claim "contain[ed] no restriction on how the result [was] accomplished"). Accordingly, RPost's "rooted in computer technology" and "technical solution to technical problem" arguments do not furnish the necessary "inventive concept" to confer patent-eligibility.

### iii.    Conclusion

For the foregoing reasons, the Court concludes that the '913 Patent Claims are directed to the abstract idea of collecting information about the delivery of a message and fail to add an "inventive concept" that "transforms" the idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '913 Patent Claim Nos. 1 and 2 are invalid under § 101.

### b.    '104 Patent[15]

The '104 Patent Claims disclose a method of providing information about the

---

[15] The asserted '104 Patent claims are Claim Nos. 1, 9, 27, 32. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'104 Patent Claims."

- 30 -

opening of an electronic message sent from a sender to a recipient through a server. *See* '104 Patent, col. 27 ll. 63–col. 28 ll. 16, col. 31 ll. 20–37. To accomplish this goal, the server "add[s] a link" to the electronic message that executes when the message is opened at the recipient to provide the server an indication that the message has been opened. *Id.* Pursuant to Claim 1, the server then "provid[es] an authenticatible information" related to the message, *id.* at col. 27 ll. 10–11, while under Claim 27, the server "constructs authenticatible information" and "transmits" the "indication of opening" and "authenticatible information" to the sender or originating processor, *id.* at col. 31 ll. 33–37. In full, the '104 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:
> receiving the message at a server from the sender, the server being displaced from the recipient,
> adding a link to the message by the server, the link configured to execute when the message is opened at the recipient to provide an indication that the message has been opened by the recipient,
> transmitting the message and the link from the server to the recipient,
> executing the link when the message is opened at the recipient to control the server to provide an indication that the message has been opened at the recipient,
> providing an authenticatible information related to the message, including the indication of the opening of the message at the recipient, at the server,
> transmitting the indication of the opening of the message at the recipient, and the authenticatible information from the server to the sender.

*Id.* at col. 27 ll. 63–col. 28 ll. 16.

> **9**. The method of claim **1**, wherein transmitting the authenticatible information includes transmitting a representation of the message.

*Id.* at col. 28 ll. 49–51.

> **27**. A system for transmitting a message from an originating processor to a recipient processor in an electronic mail system and providing an indication that the message was opened by the recipient processor, comprising:

- 31 -

1
2
3
4
5

       a server in electronic communication in the electronic mail system, the server receiving the message from the originating processor and adding a link to the message before transmitting the message and link to the recipient processor, the link being configured to execute automatically when the message is opened at the recipient processor to control the server to provide an indication at the server that the message has been opened at the recipient processor; and

6

       wherein the server constructs authenticatible information related to the message; and

7
8

       wherein the server transmits the indication of the opening of the message at the recipient processor and the authenticatible information to the originating processor.

9

*Id.* at col. 31 ll. 20–37.

10
11
12

       **32**. The system of claim **27**, wherein the server transmits the indication of the opening of the message at recipient processor and the authenticatible information to the originating processor in a secure, verifiable manner.

13

*Id.* at col. 32 ll. 1–4.

14

      **i.**    **Step One: Patent-Ineligible Concept**

15

Similar to the '913 Patent Claims, the Court finds that the '104 Patent Claims are

16

directed to the abstract idea of collecting and providing information about the opening of

17

a message. The minor variation between the concepts—message "delivery" and message

18

"opening"—is inconsequential. Rather, the concept at the heart of the '104 Patent Claims

19

is directed to a generic idea that has been implemented in the electronic messaging

20

industry for years. For example, the '104 Patent's specification recites that,

21
22
23
24
25
26
27
28

       Many existing e-mail systems and e-mail programs already provide for some form of proof of delivery. For instance, some e-mail systems today allow a sender to mark a message with 'request for notifications' tags. Such tags allow a sender to request notification that the message was delivered and/or when the message was opened. When a sender requests delivery notification, the Internet e-mail system may provide the sender with an e mail receipt that the message was delivered to the mail server or the electronic inbox of the recipient. The receipt message may include the title of the message, the destination address, and the time of delivery. It may also include (depending on the types of "flags" that are provided and activated in the mailing software) a list of all the Internet "stations" that the message passed through en route to its destination. This form of reporting is

> built into some of the rules and protocols which implement e-mail.
> Furthermore, when a message is sent with a 'read notification' request, the
> recipient's email program may send to the sender an e-mail notification that
> the recipient opened that message for reading. Many electronic mail clients
> can and do support this kind of reporting; however, Internet protocols do
> not make it mandatory.

*Id.* at col. 1 ll. 41–62; *see* (Doc. 271-17 at 10) (portion of Dr. Terrance Tomkow's deposition describing pre-existing process of adding links to electronic messages that provide "read notifications" when activated at the recipient).

Furthermore, the concept of collecting and providing information about the opening of a message is analogous to other data collection and tracking methods deemed by courts to be drawn to abstract ideas. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 (holding that a patent for reading and processing the data on checks was directed to the abstract idea of "data collection, recognition, and storage," processes that are "undisputedly well-known"); *Wireless Media Innovations v. Maher Terminals*, 100 F. Supp. 3d 405, 413 (D.N.J. 2015) (concluding that concept of "monitoring locations, movement, and load status of shipping containers . . . and storing, reporting and communicating this information in various forms through generic computer functions" was too abstract for patent-eligibility); *YYZ*, 2015 WL 5886176, at *7 (finding that apparatus and method for "measuring, monitoring, tracking, and simulating enterprise or business communications and processes in an asynchronous messaging environment" was directed to an abstract idea); *Neochloris, Inc. v. Emerson Process Mgmt. LLLP*, 2015 WL 5951753, at *4–5 (N.D. Ill. Oct. 13, 2015) (holding that claims describing process of collecting data, transmitting data to computer, monitoring data using computer and software, and sending alarms when problems arise, were directed to abstract idea).

RPost's contention that the '104 Patent Claims are not directed to an abstract idea because they can verify the opening of a message without the recipient's cooperation or compliance is unpersuasive. At their core, the '104 Patent Claims simply provide information that a particular message was opened. Whether or not the '104 Patent Claims require the recipient's "cooperation" speaks not to whether the idea is abstract but to

- 33 -

1    whether the claims add an inventive concept, i.e., the second step in the *Alice* paradigm.

2    *See Ultramercial*, 772 F.3d at 715 ("We do not agree . . . that the addition of merely

3    novel or non-routine components to the claimed idea necessarily turns an abstraction into,

4    something concrete. In any event, any novelty in implementation of the idea is a factor to

5    be considered only in the second step of the *Alice* analysis.").

6        Similarly, RPost's argument that the '104 Patent Claims are not directed to an

7    abstract idea because they require "specific" steps to verify the opening of a message via

8    a tangible "intermediate server that records" and "forms" certain information is beside the

9    point; the claims merely recite the abstract idea of collecting and providing information

10    about the opening of a message. *See Alice*, 134 S. Ct. at 2358 ("The fact that a computer

11    necessarily exist[s] in the physical, rather than purely conceptual, realm . . . is beside the

12    point."). The Federal Circuit recently explained that a relevant inquiry at the first step of

13    *Alice* is to "ask whether the claims are directed to an improvement to computer

14    functionality versus being directed to an abstract idea." *Enfish*, 2016 WL 2756255, at *4.

15    Specifically, *Enfish* contrasted claims "directed to an improvement in the functioning of a

16    computer" with claims "simply adding conventional computer components to well-

17    known business practices," or claims reciting "use of an abstract mathematical formula

18    on any general purpose computer," or "a purely conventional computer implementation

19    of a mathematical formula," or "generalized steps to be performed on a computer using

20    conventional computer activity." *Id.* at *4–5; *see In re TLI Commc'ns*, 2016 WL

21    2865693, at *3 (same). Here, the '104 Patent Claims are not directed to a specific

22    improvement in computer functionality, but use conventional and generic technology to

23    perform "generalized steps" in a well-known environment. To be sure, the disclosed

24    "server" is indisputably not new,[16] and the added "link" is nothing more than a standard

25    _____

26        [16] RPost admits as much in its opposition to summary judgment. *See* (Doc. 299 at

27    19) ("The inventive concept of the asserted claims does not lie in the computer
      hardware."). Furthermore, the server is described simply in terms of performing generic

28    computer functions such as transmitting, receiving, and storing data. *See* '104 Patent, col.
      27 ll. 63–col. 28 ll. 16, col. 31 ll. 20–37. But these functions are described in vague terms

- 34 -

1    hyperlink configured to execute at a certain time,[17] which certainly is not inventive.

2         Finally, the '104 Patent Claims do not solve "a challenge particular to the

3    Internet." *DDR Holdings*, 773 F.3d at 1256–57. As explained above, the problem

4    purportedly "solved" by the Tomkow Patents was long prevalent in the pre-Internet,

5    analog world, and there is nothing unique to the Internet about collecting and providing

6    information about the opening of a message. Despite RPost's endeavors to describe the

7    '104 Patent Claims as performing "specific" steps to provide "specific" information, the

8    claim language divulges nothing more than the process of transmitting a message, adding

9    a link to the message, and storing information about the message. These are all abstract

10   ideas individually, and in ordered combination, the steps recite an abstraction—an idea,

11   having no particular concrete or tangible form; namely, a method of receiving and

12   transmitting electronic messages and collecting the relevant data as to the opening of the

13   message. *See Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations,

14   such as consulting an activity log, add a degree of particularity, the concept embodied by

15   the majority of the limitations describes only [an] abstract idea.").

16        For these reasons, the Court finds that, like the claims at issue in *Content*

17   *Extraction* which were directed to "collecting data," "recognizing certain data within the

18   collected data set," and "storing the recognized data in memory," 776 F.3d at 1347,

19   collecting and providing information about the opening and delivery of a message is a

20   well-established "basic concept" that is patent-ineligible under *Alice* step one.

21                    **ii.    Step Two: Inventive Concept**

22        RPost insists that the '104 Patent Claims add an inventive concept to the abstract

23   idea because after "receiving" the message, the server adds a link that is "configured to

24   execute" upon opening of the message, thereby generating an "indication" that the

25   ───────────────────────────────

26   without any meaningful limitations and thus, the "focus of the patentee and of the claims

27   was not on an . . . improved server." *In re TLI Commc'ns*, 2016 WL 2865693, at *4.

28        [17] At *Markman*, the Court construed the claim term "link" by its plain and ordinary
     meaning because it needed no clarification or explanation. (Doc. 219 at 35–36).

                              - 35 -

message was opened. (Doc. 299 at 18). RPost claims that evidence of an inventive concept is seen by the server "transforming" the indication into something more, i.e., "authenticatible information." (*Id.*) According to RPost, the inventive concept resides in these "technical features" which enable a sender to verify the opening of a message without the recipient's "cooperation" or "compliance." (*Id.* at 18–19).

To begin, "links" or "tags" have been added to electronic messages for decades. As the '104 Patent's specification teaches, "read notifications" and "request for notification" tags have long been appended to electronic messages and are commonplace in the electronic messaging industry. *See* '104 Patent, col. 1 ll. 41–62. Moreover, Dr. Tomkow testified that the concept of inserting hyperlinks into e-mail was well-known before the Tomkow Patents, *see* (Doc. 294 at 30–31), as were Internet links and hyperlinks, *see* (*id.*; Doc. 271-17 at 10). Thus, merely adding a "link" to a message is not inventive. *See Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1344 (Fed. Cir. 2013) (finding that the use of "hypertext" to communicate information "was a routine incorporation of Internet technology into existing processes").

Similarly, the claimed "server" "fail[s] to add an inventive concept sufficient to bring the abstract idea into the realm of patentability." *In re TLI Commc'ns.*, 2016 WL 2865693, at *5. "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of [the inventive concept] analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known in the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359). Here, the server merely "receives" a message, "adds" a link to the message, and "transmits" the message. These steps fall squarely within Supreme Court and Federal Circuit precedent finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea. *See, e.g.*, *id.* at 1345, 1348 (holding that "storing information" into memory and using a computer to "translate the shapes on a physical page into typeface characters" was insufficient to confer patent eligibility); *Alice*, 134 S. Ct. at 2361 ("Nearly every computer will include a

- 36 -

'communications controller' and a 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims."); *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Mortg. Grader*, 811 F.3d at 1324–25 (holding that claimed components "interface," "network," and "database" were merely "generic computer components" insufficient to confer eligibility); *Intellectual Ventures I*, 792 F.3d at 1368 (finding that claimed components "database," "user profile," and "communication medium" did not confer eligibility).

To the extent RPost argues that the link itself is "inventive" because it is "configured to execute when the message is opened" thereby removing the need for recipient "cooperation," *see* (Doc. 299 at 18), the Court disagrees. A component that "can be configured" to perform a claimed function—without more—is neither sufficiently described nor sufficiently innovative to transform an abstract idea into patent-eligible subject matter. *See Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008–09 (Fed. Cir. 2014) (rejecting argument that unclaimed features are relevant for patent-eligibility purposes). Thus, to broadly claim a method of accomplishing a routine function requires more than just an "apply it" directive, even if in a specific technical environment. *See, e.g.*, *Alice*, 134 S. Ct. at 2358 ("[I]f a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on . . . a computer, . . . that addition cannot impart patent eligibility." (citing *Mayo*, 132 S. Ct. at 1301)); *Intellectual Ventures I*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." (quoting *Alice*, 134 S. Ct. at 2359–60)).

Equally unpersuasive is RPost's thin argument that the '104 Patent Claims' "transform[ation]" of the "indication" into "authenticatible information" signals an inventive concept. The Federal Circuit has held that the machine-or-transformation test can provide a "useful clue" during the second step of the *Alice* framework. *See Bancorp Servs.*, 687 F.3d at 1278. Thus, a claimed process can be patent-eligible under § 101 if:

- 37 -

"(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds by Bilski*, 561 U.S. 593. In this case, the claim language does not substantiate RPost's contention that the "indication" is "transformed" into "authenticatible information." Rather, the claim language simply recites that the server "provid[es] an authenticatible information related to the message, including the indication of the opening of the message," '104 Patent, col. 28 ll. 10–12, and "constructs authenticatible information," *id.* at col. 31 ll. 33–34. The claim language does not disclose or even imply that the "indication" is in any way "transformed."[18] RPost's argument is therefore flawed from the start.[19] Even if the "indication" was "transformed" into "authenticatible information," the '104 Patent Claims still do not disclose any details as to *how* the "transformation" transpires, nor do they inform that the "transformed" product, i.e., "authenticatible information," is anything more than the general, pre-existing "indication." Such free-standing information is simply not patentable. *See Digitech*, 758 F.3d at 1350 ("Data in its ethereal, non-physical form is simply information that does not fall under any of the categories of eligible subject matter.").

As was the case in *Alice*, the Court finds that "the function performed by the computer at each step of the process is '[p]urely conventional.'" *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1298). Simply narrowing an abstract idea implemented by pre-existing components to a particular technological environment is insufficient to pass

---

[18] This is in contrast to the '389 and '199 Patent Claims which, as discussed below, disclose that a "first information" is "form[ed] . . . *from*" a particular indication and certain other information.

[19] In fact, the claim language implies the *opposite* of RPost's argument. Namely, the '104 Patent Claims disclose that at the end of the claimed process, the server transmits the "indication of the opening of the message . . . *and* the authenticatible information" to the sender. *Id.* at col. 28 ll. 14–16, col. 31 ll. 35–37 (emphasis added). Pragmatically, there would be no reason to provide the sender with *both* pieces of information if they included the *same* information. Thus, this suggests that the "authenticatible information" is formed from other, non-claimed information.

- 38 -

muster under § 101. *See, e.g.*, *Digitech*, 758 F.3d at 1348–51 (holding that claims directed to digital image processing using math to combine data into a device profile were too abstract despite narrow application); *Planet Bingo*, 576 F. App'x at 1009 (finding that claims failed to add an inventive concept to abstract idea because the claims merely "recite a program that is used for the generic functions of storing, retrieving, and verifying a chosen set of bingo numbers against a winning set of bingo numbers"). The § 101 inquiry is focused on the claim language and whether the ordered combination of the limitations disclose patent-eligible subject matter or add an inventive concept to an abstract idea. Here, the '104 Patent Claims fail to recite any elements that individually or as an ordered combination transform the abstract idea of collecting and providing information about the opening of a message into a patent-eligible application.

### iii.    Conclusion

For these reasons, the Court concludes that the '104 Patent Claims are directed to the abstract idea of collecting and providing information about the opening of a message and fail to add an inventive concept to confer patent eligibility. *Alice*, 134 S. Ct. at 2355. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '104 Patent Claim Nos. 1, 9, 27, and 32 are invalid under § 101.

### c.    '198 Patent[20]

The '198 Patent, a continuation of the '104 Patent, claims a method of providing information about the opening and delivery of an electronic message sent from a sender to a recipient through a server. *See* '198 Patent, col. 28 ll. 6–25, col. 29 ll. 11–27, col. 30 ll. 7–25. To achieve this goal, a server adds a link to the electronic message that is "configured to execute when the link is activated at the recipient" to provide the server an indication that the message has been opened or delivered. *Id.* The server then forms "authenticatible information" relating to the message, which includes the indication of

---

[20] The asserted '198 Patent claims are Claim Nos. 1, 6, 7, 10, 18, 23, 32, 35. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'198 Patent Claims."

- 39 -

opening or delivery, and transmits the "authenticatible information" to the sender. *Id.* In full, the '198 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:
>
> receiving the message at a server from the sender, the server being displaced from the recipient,
>
> associating a link with the message by the server, the link configured to execute when the link is activated at the recipient to provide an indication that the message has been opened by a recipient,
>
> transmitting the message and the link from the server to the recipient,
>
> executing the link when the link is activated at the recipient to control the server to provide an indication that the message has been delivered to the recipient,
>
> providing an authenticatible information related to the message, including the indication of the delivery of the message at the recipient, at the server, and
>
> transmitting the indication of the delivery of the message at the recipient, and the authenticatible information from the server to the sender.

*Id.* at col. 28 ll. 6–25.

> **6**. The method of claim **1**, wherein the link is activated at the recipient to provide an indication that the message has been opened by the recipient.
>
> **7**. The method of claim **6**, wherein the indication of the opening of the message at the recipient, and the authenticatible information are stored in a memory.

*Id.* at col. 28 ll. 39–44.

> **10**. The method of claim 1, wherein the indication of the delivery of the message, and the authenticatible information are stored in a memory.

*Id.* at col. 28 ll. 50–53.

> **18**. A system transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:
>
> a server in electronic communication with the sender and the receiver, the server programmed to receive a message from the sender, to associate a link with the message, the link configured to execute when the link is activated at the recipient to provide an indication that the message

- 40 -

1
2
3
4
5
6

has been opened by a recipient, to transmit the message and the link from the server to the recipient, wherein

the link is executed when the link is activated at the recipient to control the server to provide an indication that the message has been opened at the recipient, and

wherein the server is programmed to form an authenticatible information related to the message, and to transmit the indication of the opening of the message at the recipient and the authenticatible information from the server to the sender.

7

*Id.* at col. 29 ll. 11–28.

8
9

**23**. The system of claim **18**, wherein the indication of the opening of the message at the recipient, and the authenticatible information are stored in a memory.

10

*Id.* at col. 29 ll. 41–43.

11
12
13
14
15
16
17
18
19
20
21

**32**. A system transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:

a server in electronic communication with the sender and receiver, the server programmed to receive a message from the sender, to associate a link with the message, the link configured to execute when the link is activated at the recipient to provide an indication that the message has been delivered to a recipient, to transmit the message and the link from the server to the recipient, wherein

the link is executed when the link is activated at the recipient to control the server to provide an indication that the message has been delivered to the recipient; and

wherein the server is programmed to form an authenticatible information related to the message, and to transmit the indication of the delivery of the message to the recipient and the authenticatible information from the server to the sender.

22

*Id.* at col. 30 ll. 7–25.

23
24

**35**. The system of claim **32**, wherein the indication of the delivery of the message to the recipient, and the authenticatible information are stored in a memory.

25

*Id.* at col. 30 ll. 31–33.

26

### i.    Step One: Patent-Ineligible Concept

27
28

As a continuation of the '104 Patent, the '198 Patent incorporates the same features and components as its parent, such as a "server," a "link," a "message," an

- 41 -

"MTA," a "recipient," a "sender," and "memory." Also similar is the general concept of the '198 Patent. Like the '104 Patent Claims, the '198 Patent Claims disclose a method of providing information about the opening of a message. And like the '913 Patent Claims, the method described in the '198 Patent Claims also provides information about the delivery of a message, albeit via activation of a link.

Because there is no practical difference between the concepts of these three patents, the Court finds that the '198 Patent Claims are directed to the same abstract ideas as the '913 and '104 Patent Claims, to wit, collecting and providing information about the opening and delivery of a message. Consequently, for the reasons expressed above, the Court finds that the '198 Patent Claims are directed to the patent-ineligible abstract idea of collecting and providing information about the opening and delivery of a message.

### ii.      Step Two: Inventive Concept

Likewise, for the reasons detailed above regarding the '913 and '104 Patent Claims, the Court concludes that the '198 Patent Claims fail to add "significantly more" to the claimed abstract idea such that the idea is "transformed" into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. The functions recited by the '198 Patent Claims, e.g., receiving a message, transmitting a message, adding a link, and storing information using pre-existing components, are "conventional activities" that "nearly every computer" can perform. *Id.* at 2361. Thus, because "[i]nstructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible," *Intellectual Ventures I*, 792 F.3d at 1368 (quoting *Alice*, 134 S. Ct. at 2359–60), the Court concludes that the '198 Patent Claims do not add an inventive concept to the abstract idea.[21]

---

[21] Additionally, the '198 Patent Claims recite that the "associated" link executes "when activated at the recipient." '198 Patent, col. 28 ll. 17–19. Unlike the '104 Patent Claims, the '198 Patent Claims do not indicate *when* this activation takes place or *how* the link is activated. Rather, the link simply executes when it is activated, thereby causing the '198 Patent Claims to be even more opaque than the '104 Patent Claims.

- 42 -

### iii.    Conclusion

For the foregoing reasons, the Court finds that the '198 Patent Claims are directed to the abstract idea of collecting and providing information about the delivery and opening of a message and fails to add an inventive concept sufficient to confer patent eligibility. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '198 Patent Claim Nos. 1, 6, 7, 10, 18, 23, 32, and 35 are invalid under § 101.

### d.    '389 Patent[22]

The '389 Patent discloses a "system and method of verifying delivery and integrity of electronic messages." '389 Patent, (54). Like the '913 Patent Claims, the '389 Patent Claims attain this goal by using a server that receives a portion of a mail transport protocol dialog generated by the transmission of the message from the server to the recipient and an indication that the recipient has received the message. *Id.* at col. 27 ll. 58–67. The server then "form[s]" a "first information" from this data and "transmit[s]" it to the sender. *Id.* at col. 28 ll. 1–7. In full, the '389 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient through a server displaced from the recipient, the steps at the server comprising:
>
> receiving the message at the server from the sender;
> transmitting the message to the recipient;
> receiving at the server at least a portion of a mail transport protocol dialog generated during transmission of the message from the server to the recipient;
> receiving at the server from the recipient an indication of the receipt of the message by the recipient;
> forming at the server a first information from the at least a portion of the mail transport protocol dialog and the indication of the receipt of the message by the recipient; and
> transmitting, before any authentication of the message, a copy of the message and the first information to the sender from the server.

---

[22] The asserted '389 Patent claims are Claim Nos. 1, 7, 12, 14, and 15. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'389 Patent Claims."

- 43 -

*Id.* at col. 27 ll. 58–col. 28 ll. 7.

**7**. A system for transmitting a message through an electronic mail system from an originating processor to a recipient processor and providing proof of receipt of the message by the recipient processor, comprising:

a server displaced from the originating processor, the server capable of being configured by software commands to:

receive a message from the originating processor and to transmit the message to the recipient processor;

receive an indication of receipt of the message from the recipient processor and a mail transport protocol dialog generated by the electronic mail system during transmission of the message from the server to the recipient processor;

generate a first information including the indication of receipt of the message from the recipient processor and at least a portion of the mail transport protocol dialog generated by the electronic mail system during transmission of the message from the server to the recipient processor.

*Id.* at col. 28 ll. 33–52.

**12**. The system of claim **7**, further comprising a memory and wherein the server is further configured to store a copy of the message and the first information to the originating processor in the memory before any authentication of the message by the server.

*Id.* at col. 29 ll. 8–12.

**14**. A method of transmitting a message from a sender to a recipient through a server displaced from the recipient, the steps at the server comprising:

receiving the message at the server from the sender, transmitting the message to the recipient;

receiving at the server from the recipient a first information including an indication of the receipt of the message by the recipient and at least a portion of a generated during transmission of the first information from the server to the recipient; and

storing a representation of the message and the first information received by the server from the recipient in a memory, before any authentication of the message.

**15**. The method of claim **14**, further comprising:

transmitting the representation of the message and the first information received by the server from the recipient to the sender from the server, before any authentication of the message.

*Id.* at col. 29 ll. 16–col. 30 ll. 13.

- 44 -

### i.    Step One: Patent-Ineligible Concept

Like the '913, '104, and '198 Patent Claims, at the heart of the '389 Patent Claims is the general concept of collecting and providing information about a particular message, which is similar to methods of "tracking," "monitoring," and "data collection," that courts have deemed to be directed to abstract ideas. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347–48 ("data collection, recognition, and storage"); *Wireless Media Innovations*, 100 F. Supp. 3d. at 413 ("monitoring locations, movement, and load status . . . and storing, reporting and communicating this information in various forms through generic computer functions"); *YYZ*, 2015 WL 5886176, at *7 ("measuring, monitoring, tracking, and simulating enterprise or business communications and processes in an asynchronous messaging environment"); *Neochloris*, 2015 WL 5951753, at *4–5 ("collecting," "transmitting," and "monitoring" data). Consequently, the Court finds that the '389 Patent Claims are directed to the abstract idea of collecting and providing information about the receipt of a message.

### ii.    Step Two: Inventive Concept

RPost contends that the '389 Patent Claims add an inventive concept because they recite "specific ways to verify delivery of an electronic message using specific information." *See* (Doc. 299 at 14). Particularly, RPost explains that the claims require the server to receive a "portion of a transport protocol dialog generated between the server and a recipient during transmission of an electronic message" and an "indication of receipt" of the message from the sender in order to "form" and "transmit" a "first information" to the sender. *Id.*

Arguing that something is specific does not make it so. To be sure, underpinning RPost's "specifics" is "the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *DDR Holdings*, 773 F.3d at 1257. This is not a case where the claims are directed to "a problem specifically arising in the realm of computer technology." *DDR Holdings*, 773 F.3d at 1257. Rather, the problem of verifying the receipt of a message existed in the pre-

1   Internet, analog world, and the '389 Patent Claims simply disclose a process "for which
2   computers are invoked merely as a tool." *Enfish*, 2016 WL 2756255, at *5.

3       Moreover, "whether or not [RPost] has added that special 'something more' to this
4   conventional business practice is determined by the quality, not the quantity, of its
5   specific adornments and limitations." *Mobile Telecomms. Techs., LLC v. United Parcel
6   Serv., Inc.*, 2016 WL 1171191, at *7 (N.D. Ga. Mar. 24, 2016). Here, the server disclosed
7   in the '389 Patent Claims performs three general functions: "receiving" information,
8   "transmitting" information, and "forming" information. It is well-settled that "receiving"
9   and "transmitting" functions are conventional activities. *See Alice*, 134 S. Ct. at 2355.
10  The only arguably inventive concept is "forming" of "first information." However, the
11  '389 Patent Claims do not chronicle *how* the "forming" is performed or even indicate that
12  the "first information" is anything more than the pre-existing input information, i.e., "at
13  least a portion of the mail transport protocol dialog and the indication of the receipt of the
14  message by the recipient." '389 Patent, col. 28 ll. 1–3.[23] As stated above, mere
15  information—even information formed from "verifiable information" as RPost
16  contends—is not patentable. *See Digitech*, 758 F.3d at 1350. Consequently, no inventive
17  concept has been added by the claims.

### iii.    Conclusion

19      For the foregoing reasons, the Court finds that the '389 Patent Claims are directed
20  to the abstract idea of collecting and providing information about the receipt of a message
21  and fail to add an inventive concept sufficient to confer eligibility. Accordingly, the
22  Court will grant GoDaddy's motion for summary judgment on this issue and declare that
23  '389 Patent Claim Nos. 1, 7, 12, 14, and 15 are invalid under § 101.

24
25
26
_____

27      [23] Contrary to RPost's argument, the PTAB did not "find" or "recognize" that the
    "forming" step of the '389 Patent was a "technical feature that solves a technical
28  problem." (Doc. 299 at 18–19). Instead, the PTAB merely determined that the petitioner
    failed to meet its burden of proof to institute a CBM patent review. (Doc. 304-4 at 9–10).

e.    **'199 Patent**[24]

The '199 Patent, a continuation of the '389 Patent, claims a method of providing information that an electronic message sent from a sender to a recipient through a server failed to be delivered. '199 Patent, col. 27 ll. 58–col. 28 ll. 15. To accomplish this objective, the '199 Patent Claims recite the same components and processes as the '389 Patent Claims, i.e., a server receives a portion of a mail transport protocol dialog generated by the transmission of the message from the server to the recipient and an indication from the recipient and then "form[s]" a "first information" from that data and "transmit[s]" it to the sender. *Id.* at col. 27 ll. 58–col. 28 ll. 7. The lone distinction between the '199 and '389 Patent Claims is that the "indication" received by the '199 Patent server indicates the failure of message delivery. *Id.* at col. 27 ll. 66–67. In full, the '199 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient through a server displaced from the recipient, the steps at the server comprising:
> receiving the message at the server from the sender;
> transmitting the message to the recipient;
> receiving at the server at least a portion of a data transport protocol dialog generated during transmission of the message from the server to the recipient; and
> receiving at the server from the recipient an indication of the failure to deliver the message to the recipient;
> forming at the server a first information from the at least a portion of the data transport protocol dialog and the indication of the failure to deliver the message by the recipient; and
> transmitting, before any authentication of the message, a copy of the first information to the sender from the server.
>
> **2**. The method of claim **1**, wherein the copy of the first information is stored in a memory in communication with the server.

---

[24] The asserted '199 Patent claims are Claim Nos. 1, 2, and 3. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'199 Patent Claims."

- 47 -

**3**. The method of claim **1**, wherein transmitting, before any authentication of the message, includes transmitting a copy of the message and the first information to the sender from the server.

'199 Patent, col. 27 ll. 58–col. 28 ll. 14.

### i.    Step One: Patent-Ineligible Concept

Like the asserted claims of its parent application, the Court finds that the '199 Patent Claims are directed to an abstract idea, namely, collecting and providing information that a message was not delivered. The problem purportedly solved by the '199 Patent Claims long permeated the pre-Internet, analog world, while the concept of providing information that an electronic message failed to be delivered has been implemented by standard SMTP "bounce" code for dozens of years. *See* (Docs. 258 at 8; 271-11 at 6; 300 at 7). Moreover, the concept of collecting and providing information that a message was not delivered is similar to other concepts found by the Federal Circuit to be directed to abstract ideas. *See CyberSource*, 654 F.3d at 1370 (finding that "collection and organization of data" is directed to abstract idea); *Content Extraction*, 776 F.3d at 1347–48 (finding that "collecting data," "recognizing certain data within the collected data set," and "storing the recognized data in memory" were directed to a patent-ineligible concept). Consequently, the Court finds that the '199 Patent Claims are drawn to an abstract idea.

### ii.    Step Two: Inventive Concept

Like its parent application, at the heart of '199 Patent Claims is a method "for which computers are invoked merely as a tool." *Enfish*, 2016 WL 2756255, at *5. There is nothing new about the concept of providing information that a message was not delivered—generic SMTP code has performed this feat for decades. *See* (Docs. 258 at 8; 271-11 at 6; 300 at 7). Further, as a continuation of the '389 Patent, the '199 Patent Claims merely recite the same conventional steps, e.g., "transmitting," "receiving," and "forming," that are implemented by generic components, e.g., a "server," a "sender," and a "recipient," that decidedly do not add an inventive concept to the claims. *See, e.g.*, *Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps

- 48 -

does not make an invention patent-eligible."); *Intellectual Ventures I*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." (quoting *Alice*, 134 S. Ct. at 2359–60)). Accordingly, the Court concludes that no inventive concept has been added to the '199 Patent Claims sufficient to transform the abstract idea into a patent-eligible application.

### iii.    Conclusion

For these reasons, the Court finds that the '199 Patent Claims are directed to the abstract idea of collecting and providing information that a message was not delivered and failed to add an inventive concept sufficient to confer eligibility. The Court will therefore grant GoDaddy's motion for summary judgment on this issue and declare that '199 Patent Claim Nos. 1, 2, and 3 are invalid under § 101.

### B.    Conclusion for Patent-Eligibility

For the foregoing reasons, the Court concludes that all asserted claims of the Feldbau and Tomkow Patents are ineligible and invalid under § 101.[25] The remainder of GoDaddy's motion for summary judgment will therefore be deemed moot.[26]

### IV.    RPost's Motion for Summary Judgment

RPost moves the Court for summary judgment on Count I of GoDaddy's FAC. (Doc. 284). In Count I, GoDaddy asserts that during the parties' pre-suit discussions,

---

[25] On June 3, 2016, Judge Denise J. Casper of the United States District Court for the District of Massachusetts ruled on a motion for judgment on the pleadings in a similar case and held that the claims of the '389, '913, and '199 Patents are not directed to an abstract idea and claim an inventive concept. *See Sophos Inc. v. RPost Holdings, Inc.*, 2016 U.S. Dist. LEXIS 72699 (D. Mass. June 3, 2016). The Court has considered Judge Casper's order and gives it "weight," *see, e.g.*, *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 711 (Fed. Cir. 1983); *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 723 (Fed. Cir. 1990), but "reach[es] a contrary legal conclusion" after exercising due "caution," *see Mendenhall v. Cederapids, Inc.*, 5 F.3d 1557, 1569 (Fed. Cir. 1993).

[26] As the Federal Circuit stated, "[t]he claim being invalid there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983).

- 49 -

1    RPost fraudulently misrepresented that it had "unrestricted rights" to enforce the Asserted

2    Patents in lieu of disclosing that the patents' title was "clouded." (Doc. 46 at 12–17).

3    Specifically, GoDaddy complains that RPost did not inform GoDaddy about litigation in

4    California and Texas that "clouded" ownership of the Asserted Patents. (*Id.* at 13).

5        In its motion for summary judgment, RPost contends that there is no disputed

6    issue of material fact as to whether it fraudulently misrepresented its patent ownership

7    during pre-suit discussions with GoDaddy. *See* (Doc. 284). RPost argues that GoDaddy

8    failed to present any evidence that RPost lacked the legal right to enforce the Asserted

9    Patents and therefore cannot be liable for not disclosing "clouded" title. (*Id.* at 13). RPost

10   also maintains that GoDaddy had knowledge of the California and Texas lawsuits via

11   discussions with RPost representatives and access to public records. (*Id.*) RPost finally

12   contends that Count I suffers from two pleading errors, namely, that "omissions" cannot

13   form the basis for a fraudulent misrepresentation claim under Arizona law and that

14   GoDaddy failed to plead a necessary element of fraudulent misrepresentation. (*Id.* at 7).

15       In response, GoDaddy argues that a disputed issue of material fact exists as to

16   whether title to the Asserted Patents is "clouded." (Doc. 298). In GoDaddy's view, if

17   there is a "cloud" on a patent's title, the patent owner must disclose that fact to an alleged

18   infringer. (*Id.*) To that end, GoDaddy insists that there is a disputed issue of material fact

19   as to whether RPost fraudulently misrepresented that it possessed "unrestricted title" to

20   the Asserted Patents when a "cloud" on that title existed. (*Id.*)

21       **A.    Background**

22       The ownership of the Asserted Patents has been detailed by the Court as follows:

23       Starting in 1999, Dr. Terrance Tomkow applied for the [Asserted
         Patents], which describe a way of tracking and confirming delivery of
24       email. (Doc. 46 at 6). Kenneth Barton and Zafar Khan joined Tomkow in
         creating a corporate structure to protect this intellectual property and
25       founded RPost International and a related organization called RPost, Inc.
         (*Id.*) Tomkow, Barton, and Khan were all shareholders in RPost
26       International. (*Id.*) On September 13, 2000, Dr. Tomkow assigned his
         patent applications to RPost International, and the three principals
27       unsuccessfully pursued funding to commercialize the intellectual property
28

- 50 -

owned by RPost International. (*Id.*)

Barton's relationship with Tomkow and Khan fell apart over time, and Barton eventually brought two actions against Tomkow and Khan (the "Barton Cases"). (*Id.*) First, on August 3, 2012, a California court found that Tomkow, Khan, and RPost International had acted with malice, oppression, and fraud when they converted Barton's RPost International shares. (*Id.* at 7). Tomkow, Khan, and RPost International were ordered to restore Barton's shares and to pay punitive and general damages. (*Id.*) Second, Barton brought another state action against RPost International, RMail, and RComm alleging that RPost International, Tomkow, and Khan fraudulently transferred corporate assets, including intellectual property assets, of RPost International to RComm and RMail. (*Id.*) Barton alleges that Tomkow and Khan formed the new off-shore entity, RMail, and then as officers of both RPost International and RMail, caused $750,000 to be transferred from RPost International to RMail. (*Id.* at 8). RMail used that money to purchase RPost International's intellectual property assets, including the [Asserted Patents]. (*Id.*) RPost International then paid $200,000 to RMail as a license fee for the use of those same intellectual property assets. (*Id.*) Barton did not approve or sign any of these property transfers. (*Id.* at 9). RPost has tried to exploit the [Asserted Patents] since these transfers have occurred. (*Id.*)

Khan and Tomkow have each filed for bankruptcy under Chapter 13 (the "Bankruptcy Cases"), but Barton has objected to the bankruptcy filings for various reasons. (*Id.*) In December 2013, the bankruptcy court granted Barton's motions to convert Khan and Tomkow's Chapter 13 Bankruptcy Cases to Chapter 7 and appointed a trustee to manage their assets, including the [Asserted Patents]. (*Id.*)

RPost has filed lawsuits against several of GoDaddy's competitors alleging infringement of the Patents-in-Suit, which have been consolidated into one action called *Rmail Ltd. v. Amazon.com, Inc.*, No. 2:10-cv-258-JRG in the Eastern District of Texas (the "*Amazon* Case"), filed August 24, 2012. (*Id.* at 10–11). Just before trial, one defendant in the *Amazon* Case received correspondence from the plaintiff in the Barton Cases advising that there should be no settlement or disposition in actions involving the Patents-in-Suit until their ownership has been determined. (*Id.* at 11). In light of this correspondence, on January 30, 2014, the judge in the Eastern District of Texas stayed and administratively closed the *Amazon* Case pending resolution of the patent ownership disputes. (*Id.* at 11).

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 6908507, at *1–2 (D. Ariz. Dec. 9, 2014); (Doc. 105 at 2–3). The Court has also described the party's pre-suit discussions as follows:

- 51 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RPost first contacted GoDaddy via email on July 17, 2013 ("the Email") and advised of its belief that GoDaddy was infringing [the Asserted Patents]. (Doc. 46-4). RPost alleged in the Email that GoDaddy's "business processes and electronic messaging and document operations" infringed RPost's patents. (Doc. 46-4 at 3). The Email also suggested that GoDaddy "review the RPost patents noted below for a more complete description of RPost patented technologies and review these in the context of your technology operations." (*Id.*) The Email then listed seventeen patents owned by RPost including the Tomkow Patents, RMail Patents, and others, with no attention drawn to any particular patent in the list. (*Id.* at 3–4).

In a letter on October 4, 2013 ("the Letter"), RPost further asserted the Tomkow Patents by providing claim charts "identifying certain claims of certain patents and [GoDaddy's] infringing conduct." (Doc. 46-5 at 4). RPost brought specific attention to GoDaddy's "Express Email Marketing" product and service. (*Id.*) Only claims from the Tomkow Patents were analyzed, but RPost advised GoDaddy that "[i]t is likely that [GoDaddy's] products and services are infringing other claims of RPost's patents." (*Id.*) RPost provided a comprehensive list of patents owned by RPost at the end of the Letter, which included foreign and U.S. patents, the Tomkow Patents, RMail Patents, and pending patent applications, with no attention drawn to any specific patent.

On October 22, 2013, an RPost representative named Jerry Silver called GoDaddy's Associate General Counsel for Intellectual Property, Karl Fazio, telephonically to discuss the Email and the Letter ("the Phone Call"). (Doc. 84-2 at 3). Silver accused GoDaddy of infringing RPost's patents and brought up RPost's past litigation, indicating that RPost is not afraid to litigate in order to enforce its patents. (*Id.* at 4). Silver and Fazio discussed RPost's patents, but GoDaddy has provided no evidence that any specific patents were discussed in detail. (*See id.* at 3–4; doc. 84 at 3–4).

Finally, on or about November 19, 2013, RPost sent GoDaddy a PowerPoint presentation ("the Presentation") entitled "Summary of Preliminary Infringement Analysis." (Doc. 84 at 4). On the cover page of the Presentation, four of the Tomkow Patents were listed under a heading entitled "Patents & Claims in Analysis," and the '219 patent (an RMail Patent), along with one Tomkow Patent and three other patents, was listed under a heading entitled "Additional Recommended Review." (Doc. 84-2 at 10). On the next slide of the Presentation, there was a list of many patents owned by RPost with no attention drawn to any particular patent. (Doc. 84-2 at 11).

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 6908520, at *1–2 (D. Ariz. Dec.

1    9, 2014); (Doc. 107 at 2–3).

2        **B.    Fraudulent Misrepresentation**

3        In order to establish a fraudulent misrepresentation claim under Arizona law, a

4    claimant must show: "1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's

5    knowledge of the representation's falsity or ignorance of its truth; 5) the speaker's intent

6    that it be acted upon by the recipient in the manner reasonably contemplated; 6) the

7    hearer's ignorance of its falsity; 7) the hearer's reliance on its truth; 8) the right to rely on

8    it; and 9) his consequent and proximate injury." *Echols v. Beauty Built Homes*, 647 P.2d

9    629, 631 (Ariz. 1982).

10        Because RPost also raises a pleading deficiency in addition to seeking summary

11    judgment, the Court notes that certain elements of fraud claims carry a higher standard of

12    pleading under the Federal Rules of Civil Procedure ("Rules"). Namely, "[i]n all

13    averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

14    stated with particularity. Malice, intent, knowledge, and other condition of the mind of a

15    person may be averred generally." Fed. R. Civ. P. 9(b). "To allege fraud with

16    particularity, a [claimant] . . . must set forth an explanation as to why the statement or

17    omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d

18    1541, 1548 (9th Cir. 1994). "While statements of the time, place and nature of the alleged

19    fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient."

20    *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

21        **C.    Analysis**

22        In Count I of its FAC, GoDaddy contends that because RPost's ownership of the

23    Asserted Patents was called into question by the Barton and Bankruptcy Cases, RPost is

24    liable for fraudulently misrepresenting that it possessed "unclouded ownership in and

25    rights to enforce" the Asserted Patents. *See* (Doc. 46 at 16). In other words, GoDaddy

26    seeks to recover damages not because it believes (or has any evidence that) RPost does

27    not have the legal right to enforce the Asserted Patents, but because RPost did not inform

28    GoDaddy that a "cloud" shadows the patents' title.

1      To begin, the Court questions the propriety of RPost challenging the adequacy of

2  GoDaddy's pleading via a motion for summary judgment where it is the movant's burden

3  to either set forth evidence proving that it is entitled to judgment as a matter of law or

4  show that the non-movant cannot establish all necessary elements of its claim.

5  Nonetheless, RPost argues that "[n]on-disclosure cannot form the basis of an Arizona-

6  based fraudulent misrepresentation claim because those are well-recognized as separate

7  torts under the Arizona common law." (Doc. 315 at 7) (citing *Resort Funding, L.L.C. v.*

8  *Canyonview Dev., L.P.*, 2012 WL 3760440, at *9 (Ariz. Ct. App. Aug. 30, 2012)).

9  Although it is true that Arizona distinguishes between tort claims for fraudulent

10 misrepresentation, fraudulent concealment, and non-disclosure, *see Wells Fargo Bank v.*

11 *Ariz. Laborers Local No. 395 Pension Trust Fund*, 38 P.3d 12, 34–36 (2002), Count I of

12 GoDaddy's FAC claims that RPost affirmatively misrepresented that it possessed

13 "unclouded ownership in and rights to enforce" the Asserted Patents while failing to

14 disclose the pending California and Texas actions, (Doc. 46 at 16). Because Count I

15 alleges that RPost affirmatively represented a particular fact that was false, the Court

16 finds that Count I falls within the contours of a claim for fraudulent misrepresentation.

17 *See Wells Fargo Bank*, 38 P.3d at 34 ("Where failure to disclose a material fact is

18 calculated to induce a false belief, 'the distinction between concealment and affirmative

19 misrepresentation is tenuous.'" (quoting *Schock v. Jacka*, 460 P.2d 185, 187 (Ariz.

20 1969))).[27]

21 _____

22    [27] The Court also rejects RPost's argument that Count I suffers from a pleading
   deficiency because GoDaddy did not plead its ignorance of the falsity of RPost's
23 representations. Although GoDaddy did not plead that it lacked knowledge of the falsity
   of RPost's representations in a separate number, the Rules permit a party to plead this
24 element "generally." *See* Fed. R. Civ. P. 9(b). In this regard, Count I incorporates
   assertions that generally and plausibly allege that GoDaddy lacked knowledge of the
25 purported falsity of RPost's representations. Namely, Count I claims that GoDaddy
26 "reasonably relied to its detriment" on RPost's representations. (Doc. 46 at 17). Under
   Arizona law, one cannot "reasonably rely" on information that is false. *See Fectay v.*
27 *Tahiri*, 2015 WL 7710272, at *2 (Ariz. Ct. App. Nov. 30, 2015). Thus, by pleading that it
28 "reasonably relied" on RPost's representations, GoDaddy "generally" pled that it lacked

- 54 -

Despite overcoming RPost's pleading deficiency arguments, GoDaddy failed to establish that any of RPost's representations were, in fact, false. After substantial review of the parties' papers, the Court finds that GoDaddy has not articulated any disputed issue of material fact as to "why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548. The fundamental problem with Claim I is its underlying assumption that RPost had an obligation to inform GoDaddy about the alleged "cloud" on the Asserted Patents' title. *See* (Doc. 46 at 16).[28] GoDaddy, however, advanced no evidence or binding authority demonstrating that "free and clear" ownership is necessary to *assert* a patent. The lone case cited by GoDaddy in this regard is an unpublished decision from the Southern District of New York that insignificantly remarks that "people do not ordinarily pay lawyers to bring lawsuits to enforce patents that they do not own." *Advanced Video Techs. LLC v. HTC Corp.*, 2015 WL 7621483, at *11 (S.D.N.Y. Aug. 28, 2015). Only through a particularly pretentious reading of this statement could a reader smoke out any indication that a patent owner must inform an alleged infringer about a "cloud" on the patent's title, let alone arrive at the conclusion that a patent owner must own its patent "free and clear" to assert it.[29]

In any event, GoDaddy's belief that RPost must have had "free and clear" title in

---

knowledge of the representation's alleged falsity.

[28] The half-page of footnotes in GoDaddy's brief explaining the "clouded title" doctrine all relate to the *sale* of *real property*. *See* (Doc. 298 at 6). In contrast, the provision of the Patent Act describing patent ownership states that "patents shall have the attributes of *personal property*." 35 U.S.C. § 261 (emphasis added). The only case GoDaddy cites to support its conclusory theory that "[t]he clouded or defective title doctrine, though typically arising in real property, applies with equal force to titles of patents" is a 114 year-old case issuing from the D.C. Circuit. *See* (Doc. 298 at 6) (citing *Columbia Nat'l Sand Dredging Co. v. Miller*, 20 App. D.C. 245, 252 (D.C. Cir. 1902)). In any event, GoDaddy cites no authority to establish that *asserting* a patent (personal property) against an alleged infringer is akin to the *sale* of real property.

[29] GoDaddy also cites Rule 11 to support its argument that a patent must be owned "free and clear" in order to be enforced. (Doc. 298 at 5). Rule 11, however, deals with pleadings made to a court of law and certainly has no bearing on whether a patent must be owned "free and clear" to be asserted before litigation. *See* Fed. R. Civ. P. 11(b).

- 55 -

order to assert its patents against GoDaddy in pre-litigation discussions is not required under the law. Rather, the question of patent ownership focuses on whether RPost had "legal title" to enforce the patents. *See, e.g.*, *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1375–76 (Fed. Cir. 2007) ("A plaintiff must demonstrate legal title to the patent at the inception of the lawsuit to be entitled to sue for patent infringement."); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) ("[O]ne seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement." (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40–41 (1923))); *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) ("[I]n order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit.").

Consequently, as the party alleging fraudulent misrepresentation of patent ownership, GoDaddy bears the burden of proving that RPost lacked "legal title" to the Asserted Patents at the time of the representations. In this regard, GoDaddy failed to provide any evidence showing that RPost did not have "legal title" to the patents, and no court has determined otherwise.[30] Alleged clouded title to a patent does not mean that the patent owner lacks legal title to assert that patent. *See Arachnid*, 939 F.2d at 1577–82 (holding that although a third-party's legal title to the asserted patent was questioned by a challenger's equitable title at the time of the alleged infringement, only the legal title-holder had the right to sue for money damages).[31]  Because GoDaddy "fail[ed] to make a

---

[30] The Court explained this concept in its prior Order dismissing Counts III–XII of GoDaddy's FAC against certain RPost-affiliated entities. *See GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 7263537, at *6 (D. Ariz. Dec. 9, 2014); (Doc. 106 at 9). Specifically, the Court identified that the "legitimacy of the assignment of the Tomkow Patents . . . is not the present issue before the Court, nor has that assignment been deemed fraudulent by any court to date." *Id.*

[31] Again, the singular case cited by GoDaddy to argue that RPost should be liable for fraudulently misrepresenting "unrestricted patent infringement litigation rights" is untenable. *See* (Doc. 298 at 13) (citing *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F.

showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," *Celotex*, 477 U.S. at 322, summary judgment in favor of RPost is appropriate.

Moreover, to prevail on a claim for fraudulent misrepresentation, GoDaddy must show that RPost made a misrepresentation of *fact. See Wells Fargo Bank*, 38 P.3d at 34 n.22. In several instances, GoDaddy conflates representations of fact with representations of opinion. For example, GoDaddy asserts that Mr. Khan fraudulently termed RPost's ongoing litigation in California and Texas as "nothing to worry about" and "frivolous." (Doc. 308-1 at 189). These assertions, however, were certainly not representations of *fact*, but were Mr. Khan's *opinions* that the ongoing cases concern unproven allegations—which, to this day, still do. Whether GoDaddy relied on these statements is inconsequential to the inquiry of whether the representations were of *fact*, an element of fraud to which GoDaddy bears the burden of proof. *See Caruthers v. Underhill*, 287 P.3d 807, 816 (Ariz. Ct. App. 2012) ("Expressions of opinion are not material facts sufficient to support a claim of fraud." (citation omitted)).

Finally, even assuming a "cloud" covered RPost's title to the Asserted Patents and RPost's representations of "unclouded ownership" were false, GoDaddy failed to present evidence that the representations were "material." Namely, even if a "cloud" existed, that does not mean RPost did not have the legal right to enforce the patents, *see Arachnid*, 939 F.2d at 1577–82, and GoDaddy provided no evidence proving that RPost did not possess legal title to the patents at the time of the representations. Without such evidence, RPost's

Supp. 2d 1055 (C.D. Cal. 2009)). In *Intamin*, the court determined that a patentee "misrepresent[ed] . . . its ownership interest in the patent" pursuant to the unclean hands doctrine when it sent a demand letter to an alleged infringer but *did not own* the patent. 623 F. Supp. 2d at 1072, 1077–78. In this case, the doctrine of unclean hands is not at issue, and, more importantly, GoDaddy has set forth no evidence that RPost does not own the Asserted Patents. In fact, GoDaddy even appears to concede that RPost *currently* owns and has the right to enforce the patents. *See* (Doc. 298 at 10) ("A jury will see from these claims that they created a cloud on title to the RPost Patents, with the resulting material risk that RPost *would lose ownership of and the right to enforce the patents altogether* . . . ." (emphasis added)).

- 57 -

representation of "unclouded ownership" could not have been "material" for fraud.

### D.    Conclusion on RPost's Motion for Summary Judgment

Accordingly, the Court finds that even if all justifiable inferences are construed in GoDaddy's favor, no disputed issue of material fact exists such that a reasonable jury could find RPost liable on Count I of the FAC. GoDaddy failed to set forth any evidence that RPost's representations of legal title to the Asserted Patents were materially false even assuming the title was "clouded." Simply because a third party makes a claim to a patent's title does not mean the patent owner simultaneously forfeits its legal right to enforce the patent. Thus, the Court will grant RPost's motion for summary judgment.

## V.    Conclusion

Based on the foregoing,

**IT IS ORDERED** that GoDaddy's Motion for Summary Judgment (Doc. 257) is **GRANTED** and the Court **DECLARES** as follows:

- The asserted claims of the '219 Patent, Claim Nos. 60, 62, 66, and 69, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '913 Patent, Claim Nos. 1 and 2, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '104 Patent, Claim Nos. 1, 9, 27, and 32, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '198 Patent, Claim Nos. 1, 6, 7, 10, 18, 23, 32, and 35, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '199 Patent, Claim Nos. 1, 2, and 3, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '389 Patent, Claim Nos. 1, 7, 12, 14, and 15, are **INVALID** under 35 U.S.C. § 101.

- The remainder of GoDaddy's motion for summary judgment and the remaining Counts seeking declarations in GoDaddy's First Amended

1    Complaint are deemed moot.[32]

2    **IT IS FURTHER ORDERED** that RPost's Motion for Summary Judgment on

3    Plaintiff's Count I (Fraudulent Misrepresentation of Patent Ownership) (Doc. 284) is

4    **GRANTED**.

5    **IT IS FURTHER ORDERED** that the jury trial set for August 22, 2016 is

6    **VACATED**.

7    **IT IS FINALLY ORDERED** that the Clerk of Court shall enter judgment in this

8    case with prejudice in favor of Plaintiff and against Defendants on Counts VIII–XIII and

9    XV of the First Amended Complaint.[33] Counts III–VII are **DISMISSED** without

10   prejudice as moot, Plaintiff shall take nothing on these Counts and the Clerk of Court

11   shall enter judgment accordingly on these Counts. The Clerk of Court shall enter

12   judgment in favor of Defendants and against Plaintiff on Count I of the First Amended

---

14   [32] RPost's original infringement contentions included several claims that RPost
15   decided to withdraw after the Court's *Markman* Order. *See* (Docs. 258 at 2, 12; 300 at 2,
     10). These originally-asserted but withdrawn claims are as follows: '198 Patent Claim
16   No. 40; '199 Patent Claim No. 7; '389 Patent Claim Nos. 5 and 13; and '219 Patent
17   Claim Nos. 82, 86, and 88. *See* (Docs. 191-1 at 1, 10; 258 at 2, 12; 271-5 at 2; 300 at 2,
     10). In its statement of facts, GoDaddy stated that the currently-asserted claims are as
18   follows: '219 Patent Claim Nos. 60, 62, 66, and 69; '199 Patent Claim Nos. 1, 2, and 3;
19   '198 Patent Claim Nos. 1, 6, 7, 10, 18, 23, 32, and 35; '389 Patent Claim Nos. 1, 7, 12,
     14, and 15; '913 Patent Claim Nos. 1 and 2; and '104 Patent Claim Nos. 1, 9, 27, and 32.
20   (Doc. 258 at 2, 12). In support, GoDaddy attached an e-mail from RPost's counsel dated
21   February 24, 2016, confirming these claims. *See* (Doc. 271-5 at 2). RPost did not dispute
     these statements of fact or the e-mail. (Doc. 300 at 2, 10). Consequently, the Court will
22   treat the statements of fact as true, *see* Fed. R. Civ. P. 56(e)(2), and, because GoDaddy
23   moved for summary judgment on all currently-asserted claims, no claims remain pending
     before the Court. Finally, GoDaddy's First Amended Complaint requested a declaration
24   of invalidity of "each of the Patents-in-Suit." (Doc. 46 at 38). To be clear, the Court does
25   not declare the entirety of each Asserted Patent to be invalid; rather, the Court holds and
     declares invalid the currently-asserted claims expressly listed as invalid.
26

27   [33] Because the Counts on which Plaintiff prevailed seek only a declaration,
     Plaintiff is not awarded any monetary damages. Plaintiff, should it so desire, may move
28   for an award of attorneys' fees, consistent with the Federal and Local Rules, pursuant to
     35 U.S.C. § 285.

- 59 -

Complaint. This judgment addresses the entire First Amended Complaint, (Doc. 46).[34] Due to the Declarations stated above, Defendants' Counterclaims, (Doc. 108), are **DISMISSED** in their entirety without prejudice, and the Clerk of Court shall enter judgment accordingly on the Counterclaims.

Dated this 7th day of June, 2016.

James A. Teilborg
Senior United States District Judge

---

[34] Counts II, XIV, and XVI of the First Amended Complaint were dismissed by prior Orders. *See* (Docs. 105, 107). The Court also notes that the First Amended Complaint seeks injunctive relief. *See* (Doc. 46 at 38). However, in moving for summary judgment (as opposed to partial summary judgment), Plaintiff failed to mention injunctive relief. Accordingly, the Court deems any such request to be waived. *See* Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment (explaining "that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense" and that "'partial summary judgment' . . . describe[s] disposition of less than the whole action"); *see generally Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (observing that party "abandoned" two claims plead in complaint "by not raising them in opposition to the [defendant]'s motion for summary judgment").

- 60 -

1
2
3
4
5
6
7
8

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GoDaddy.com LLC, | **NO. CV-14-00126-PHX-JAT** |
| Plaintiff, | |
| v. | **JUDGMENT IN A CIVIL CASE** |
| RPost Communications Limited, et al., | |
| Defendants. | |

**Decision by Court.**  This action came for consideration before the Court.  The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that pursuant to the Court's Order filed June 7, 2016, judgment is entered with prejudice in favor of plaintiff and against defendant on Counts VIII-XIII and XV of the First Amended Complaint. Counts III-VII are Dismissed without prejudice as moot.  Plaintiff shall take nothing on these counts.  Judgment is entered in favor of Defendants and against Plaintiff on Count I of the First Amended Complaint.  Defendants' Counterclaims are dismissed in their entirety without prejudice.

Brian D. Karth
District Court Executive/Clerk of Court

June 7, 2016

By    s/ E. Aragon
Deputy Clerk

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on September 26, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be shipped via overnight delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated: September 26, 2016

Respectfully submitted,

Hudnell Law Group P.C.

By:    /s/ Lewis E. Hudnell, III
       Lewis E. Hudnell, III

Attorneys for Defendants-Appellants
RPost Communications Limited
RPost Holdings, Inc.
RPost International Limited
RMail Limited

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 28.1(e)(3) and 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i).

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Federal Circuit Rule 32(b) because this brief contains 13,955 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(1)-(3).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in 14-point Times New Roman Font.

Dated: September 26, 2016

Respectfully submitted,

Hudnell Law Group P.C.

By:    /s/ Lewis E. Hudnell, III
       Lewis E. Hudnell, III

Attorneys for Defendants-Appellants
RPost Communications Limited
RPost Holdings, Inc.
RPost International Limited
RMail Limited